[Cite as *State v. Carter*, 2022-Ohio-91.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29091 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-2814 |
| | : | |
| CHRISTOPHER CARTER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of January, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

MATTHEW M. SUELLENTROP, Atty. Reg. No. 0089655, 6 North Main Street, Suite 400, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** Christopher Carter appeals from his conviction, following a no contest plea, to one count of aggravated possession of drugs, in violation of R.C. 2925.11(A), a felony of the second degree. The trial court sentenced Carter to a mandatory indefinite term of a minimum of two years and a maximum of three years. We will affirm the judgment of the trial court.

**{¶ 2}** Carter was indicted on November 13, 2020, and he pled not guilty. He filed a motion to suppress on December 9, 2020. The trial court held a hearing on the motion on January 8, 2021.

**{¶ 3}** At the hearing, Dayton Police Officer Josh Erwin testified that on September 9, 2020, he was on routine patrol in a marked cruiser as part of a two-man crew with Officer Sean Gallagher, when the officers received a "ShotSpotter alert." Erwin explained that ShotSpotter is a system used to detect gunfire, by means of microphones, in the area of the North Main Street Corridor; the system provides a 25 meter (or 82-foot) "radius" to check after shots are detected. Erwin stated that ShotSpotter alerts are conveyed in three ways: via dispatch, an application on officers' phones, and/or cruiser computers. Erwin stated that less than 30 seconds elapse between the shots being detected and the alert being issued. He stated that his knowledge of ShotSpotter was limited to his use of the system as a patrol officer.

**{¶ 4}** Erwin stated that on September 9, 2020, he was alerted first on his phone and then by dispatch when the gunfire was detected; the ShotSpotter alert provided information about "the location, the time, and how many rounds" had been fired. Regarding the location, Erwin stated that an alert provides the closest address to the center of the radius. Erwin testified that, in his past experience with ShotSpotter, he had

"recovered firearms off individuals" who were immediately in the radius area or were leaving the area.

{¶ 5} According to Erwin, upon receiving the alert on September 9, he and Gallagher responded to the designated address, 59 Cambridge Avenue, in less than four minutes; while en route, the officers did not observe any vehicles leaving the area or anything unusual. Erwin stated that they observed Carter "walking east away from the area of 55 Cambridge Avenue," on the north side of the road, which is the same side of the road as 59 Cambridge, at about 12:45 a.m. He stated that 55 Cambridge is approximately 50 feet from 59 Cambridge. Erwin stated that the officers did not observe anyone else in the area, any motor vehicle traffic, or any activity on any adjacent property.

{¶ 6} Erwin testified that, as he and Gallagher were traveling down Cambridge, they saw Carter walking from the immediate area of 55 Cambridge, and they stopped him in front of 41 Cambridge. Carter told the officers that he was coming from a friend's home at 55 Cambridge, but he was unable to provide the friend's name. According to Erwin, Off. Gallagher performed a pat down of Carter at that point in time, to ensure he had no weapons; during the pat down, Gallagher located methamphetamine on Carter's person. Carter was then handcuffed, placed in the rear seat of the cruiser, and read his rights. According to Erwin, after the officers spoke with Carter, they transported him to another cruiser, and he was taken to jail. Erwin identified as State's Exhibit 1 the ShotSpotter response policy of the Dayton Police Department.

{¶ 7} With regard to Carter's demeanor during their interaction, Erwin stated that Carter's "right side was canted away from us," meaning that he was turned away from the officers and the officers "were unable to observe anything on his right side." This was

noteworthy to Erwin because of a concern for firearms, which people "will tuck * * * in their waistband or have * * * in their pocket or one hip."

{¶ 8} On cross-examination, Erwin described the area around 59 Cambridge Avenue as a residential area. He stated that the officers had never arrived at 59 Cambridge because they stopped Carter at 41 Cambridge, which was one the same block. He acknowledged that he had responded to ShotSpotter alerts in the past which had not resulted in finding any firearms. Erwin stated that, when he received the ShotSpotter dispatch, he did not receive any information about any potential suspects or any physical descriptions of suspects. Erwin also did not hear gunfire himself, and when he observed Carter, Carter was casually walking and did not appear to be fleeing. Erwin testified that he did not observe any kind of weapon or contraband on Carter's person, although he could not see Carter's right side. Erwin testified that he had had no prior interaction with or knowledge of Carter and that he did not approach Carter, but remained by his cruiser on the passenger side, 20 feet from Carter. Erwin stated that Carter had been in the proximity of 59 Cambridge Avenue when the officers first observed him, and because very little time had passed since the alert, the officers believed Carter could have possibly been the shooter. In response to questions by the court, Erwin stated that Carter was walking east and he and Gallagher were traveling west when Carter was observed.

{¶ 9} Officer Gallagher testified that on September 9, 2020, he was driving the cruiser, and Erwin was in the passenger seat. In describing the ShotSpotter system, Gallagher testified that "whenever a ShotSpotter alert goes off, it pops up as a notification on your phone" and gives the location that the shots came from with a certain radius and

the number of shots fired. Gallagher stated that, when the officers pulled onto Cambridge, he observed Carter "walking east toward Salem Avenue from the general area of that Shotspotter." Gallagher stated that he had not heard any gunshots. He also stated that he did not observe anyone other than Carter in the area. Gallagher testified that, when the officers started talking to Gallagher, his voice was "shaking" and Gallaher was "obviously" nervous. After Erwin initially spoke to Carter, Gallagher performed a pat down "[d]ue to the likelihood of him being in the area at that time of a ShotSpotter, likelihood of him having a firearm"; "it was a safety issue."

{¶ 10} Gallagher stated that, during the pat down, he located around 56 grams of methamphetamine. He described the pat down procedure as follows:

So during my pat down, I started - - I always start at the waistband because that's typically the - - that's the most likely place somebody is going to conceal their firearm, and then I'll check - - I'll go down to pockets and obviously go all the way down to their ankle. Once I did the left side, I always go to the right side. Upon that, I felt the - - it was - - it was packaged very tight. A glasslike substance. It's very hard. And it was packaged like a baseball. And he was wearing mesh basketball shorts, and it was just - - it was just sticking right out.

{¶ 11} Gallagher testified that, based on his training and experience, it was readily apparent to him that the substance was a narcotic. He testified that he believed the substance to be methamphetamine prior to removing it from Carter's pocket. Gallagher stated that he placed Carter in handcuffs and removed the substance from his pocket. On cross-examination, Gallagher testified that ShotSpotter alerts typically are received

very quickly, like within 30 seconds, and that he did not received information from the alert or from dispatch about a specific house or apartment; "just what the ShotSpotter application notified [him] of." When the officers stopped their cruiser about 40 to 50 feet from Carter, they had a good view of him on the sidewalk but did not see any contraband or weapons on is person. During the pat down, after feeling a lump, Gallagher "immediately recognized" the hard, "glassy substance" as methamphetamine from how it felt and how it was packaged. Gallagher testified that he did not suspect the object to be a weapon and that he immediately pulled it out of Carter's pocket. Gallagher testified that, in responding to ShotSpotter alerts in the past, he had sometimes found a firearm and sometimes not.

{¶ 12} Gallagher stated that at the time of the stop it "was dark, but there were street lights"; the officers did not employ their overhead lights or siren in the course of the stop. On redirect examination, Gallagher testified that Carter had been "very nervous" during the encounter and his body was shaking when he was asked to raise his arms. Gallagher also described Carter's body "canting away" from the officers, which Gallagher described as "a nervous tendency that he might be trying to conceal something."

{¶ 13} At the conclusion of Gallagher's testimony, the suppression hearing was continued to January 19, 2021, so that the State could obtain "a digital witness * * * to perhaps illuminate some of these issues" with the ShotSpotter system. However, the State was unable to produce such a witness on that date. The ShotSpotter response policy of the Dayton Police Department (State's Exhibit 1) was admitted into evidence without objection.

{¶ 14} After the hearing, Carter filed a memorandum in support of his motion to

suppress, in which he asserted that the officer's pat down in this situation had constituted a *Terry* stop, and that the officer had not had a reasonable suspicion to stop, detain, and search him. Carter cited *Florida v. L.J.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), which held that an anonymous tip that a person was carrying a gun was, without more, insufficient to justify a police officer's stop and frisk of that person. Carter asserted that this matter involved "significantly less reasonable suspicion than an anonymous tip," contending that "in this case there was no evidence * * * that [Carter] had committed, was committing, or was about to commit a crime"; he "was simply walking in an area where a gunshot may or may not have occurred."

{¶ 15} In its decision overruling Carter's motion to suppress, the court noted that Carter had argued that the officers lacked a reasonable, articulable suspicion for the stop, that a pat down is limited to a search for weapons, and that Gallagher could not have considered the methamphetamine to be a weapon justifying its removal from his pocket. On these issues, the court found as follows:

> The court finds the officers had reasonable suspicion to conduct a pat down of Carter based on the totality of the circumstances at the time of the initial encounter. The specific and articulable facts which, taken together, reasonably warranted the intrusion made on Carter [sic]. Carter was the only person in the area of and was seen by the officers walking away from the location that the ShotSpotter system identified as that from which the shots had been fired; the officers arrived within four minutes of the ShotSpotter alert in the area of 59 Cambridge. Contrary to Carter's assertions, the ShotSpotter alert system is not akin to an anonymous tip.

Instead, the system represents advanced technology at the disposal of law enforcement officers, which can detect shots fired and then triangulate to the closest street address to the location of the fired shots. Carter's movements, particularly his "canting" away from the officers, the lateness of the hour and the dark conditions also contribute to the totality of the circumstances warranting the intrusion upon Carter. Given the totality of the circumstances, the officers were justified in their investigatory stop of Defendant and the officers possessed a reasonable suspicion that Defendant was engaged in the shot that alerted them. The officers were justified in their belief that Defendant was armed and presently dangerous and considering the objective standard required by *Terry* [*v. Ohio,* 392 U.S. 1, 44 O.O.2d 383, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] and based upon the totality of the circumstances the officers acted properly in conducting a protective pat down of Defendant. The court further finds that a reasonably prudent person in the circumstances encountered by the officers would have been warranted in the belief that his safety or that [of] others was in danger.

The court must next consider whether the officers exceeded the scope outlined under *Terry.* The court notes an officer need not ignore non-threatening items that are felt during the course of a lawful *Terry* pat down. Further, the officer may seize immediately apparent contraband that is a result of the pat down. * * * In the present case, Officer Gallag[h]er felt a tightly packed, glassy substance on the right side of the Defendant

while conducting an open-hand pat-down. Based on his training and experience, it was immediately apparent to Officer Gallagher the substance he felt was methamphetamine. Although Officer Gallagher did not locate a weapon while searching Defendant, he was not required to ignore the glassy substance because he had a reasonable suspicion to perform the pat down and because Officer Gallagher was not required to ignore the glassy substance that was immediately apparent to him as methamphetamine, the item was not seized in violation of Defendant's Fourth Amendment rights.

{¶ 16} After the trial court overruled the motion to suppress. Carter entered his plea of no contest, was found guilty, and was sentenced.

{¶ 17} Carter's first assignment of error is set forth as follows in his brief:

A. THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS.

1. THE STOP. THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS AND FINDING THAT THERE WAS A REASONABLE, ARTICULABLE SUSPICION OF CRIMINAL ACTIVITY FOR AN INVESTIGATORY STOP OF DEFENDANT-APPELLANT CARTER.

2. THE PROTECTIVE FRISK. THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS AND FINDING THAT THERE WAS AN OBJECTIVELY REASONABLE, AND PARTICULARIZED SUSPICION THAT CARTER WAS ARMED AND DANGEROUS.

3. THE PROTECTIVE FRISK. THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS BECAUSE THE PROTECTIVE FRISK UNLAWFULLY EXCEEDED A LIMITED FRISK FOR WEAPONS.

{¶ 18} Carter asserts that the trial court's factual findings were not supported by competent, credible evidence and the "testimonial 'facts' [were] contradicted by logic and objective reality." According to Carter, because the "incorrect factual findings" were "inextricably intertwined" with the court's analysis of the totality of the circumstances, the legal conclusions reached by the trial court were "fatally flawed." He contends that the trial court also erred by applying "the incorrect and/or incomplete legal standard."

{¶ 19} Regarding the trial court's factual findings, Carter asserts that the trial court "fundamentally" relied on the ShotSpotter alert received by Officers Erwin and Gallagher, but that the court made "factual assumptions and consequential inferences" that were not supported by the evidence. Specifically, Carter argues that the court's determination that ShotSpotter "represents advanced technology at the disposal of law enforcement officers" shows that the court gave "dispositive weight" afforded to the ShotSpotter evidence and made it the foundation for the court's "entire legal conclusion."

{¶ 20} Carter argues that while the officers testified regarding their experience with ShotSpotter, there was no evidence presented concerning the reliability of this "advanced technology." Carter asserts that ShotSpotter is a "sophisticated system" that "also requires routine maintenance and calibration," and that reports generated by ShotSpotter "include a disclaimer that 'data provided should be corroborated with other evidentiary sources such as witness statements.' " According to Carter, "[u]nequivocally, the

testimony in this case relied upon ShotSpotter."

{¶ 21} Carter further asserts:

The trial court failed in its threshold gatekeeping obligation. The trial court erred in partly basing its motion to suppress decision upon technology that lacked an adequate foundation. The testimony of Officers Erwin and Gallagher relied upon ShotSpotter technology. Their response to the ShotSpotter alert, their decision-making process, their perception, and their ultimate act of stopping and frisking Mr. Carter were all based upon ShotSpotter. The State failed to offer any evidence that ShotSpotter was accurate or reliable. The State failed to introduce evidence of the specific ShotSpotter alert in this case. Without this basic foundation, the trial court could not properly make any factual determinations based upon that technology.

The trial court could not rely upon testimony that ShotSpotter triangulates gunshots. Without a sufficient foundation, there [was] no basis to state that it was even a gunshot that was detected on September 9, 2020 at approximately 12:40 a.m. It could have been a car back-firing. It could have been fireworks. It could have been a transponder explosion. It could have been a car accident nearby.

{¶ 22} Carter argues that, without any basic foundation about the technology, the address provided via the ShotSpotter alert was meaningless, and Carter's presence in the area of the reported alert was also meaningless in analyzing reasonable suspicion. Carter asserts that Officer Erwin testified that the reason for the stop of Carter was his

proximity to the address provided by ShotSpotter, and because this testimony is based upon a technology that had no evidentiary foundation in the record, the trial court should have disregarded the testimony and "assigned it zero weight or persuasive value." Carter also asserts that the officers' testimony that their previous experience in investigating ShotSpotter alerts sometimes resulted in finding weapons and sometimes did not, ShotSpotter provided an insufficient foundation for a belief in the presence of weapons.

{¶ 23} Carter argues that the "trial court's specific factual errors are easier to parse." He asserts that the trial court's factual determination that Carter was observed walking away from the location identified by the ShotSpotter system was "simply inaccurate," because the Dayton police department policy regarding ShotSpotter (State's Exhibit 1) recognizes that the address provided by the system on "WITHIN AN AREA" where gunshots were detected, not the specific address at which the shots were fired. Thus, Carter's presence a specific location – 59 Cambridge -- did not support a direct connection between his presence at that location and the shots fired or reasonable suspicion about him. Carter asserts that he could have been anywhere in the area identified by ShotSpotter when the gunshots were fired four minutes prior to the officers' arrival, and that the court's factual finding about his location in relation to 59 Cambridge Avenue "created a false foundation" on which it based its totality of the circumstances analysis.

{¶ 24} Carter also argues that it was "factually impossible" that he had " 'canted' away" from the officers, because the evidence established that the officers approached him from the opposite direction, and "people approaching from opposite directions results

in the right side of each individual in closer proximity."

{¶ 25} Regarding the trial court's legal conclusions, Carter asserts that this case presents an issue of first impression in Ohio and that the trial court's resolution of it was "erroneous and inapposite to fundamental legal principles that have consistently emerged from analogous caselaw published to date." Carter asserts:

> * * * First, ShotSpotter evidence, standing alone, is insufficient to establish reasonable suspicion of criminal activity. Much like furtive movements, mere presence in a high crime area, proximity to recent criminal conduct, or an anonymous tip provided to law enforcement, a ShotSpotter alert of detected gunshots at a particular location is insufficient to support reasonable suspicion. * * *

> * * * Without more, a ShotSpotter alert is nothing more than innocuous investigative information akin to furtive movements, mere presence, mere proximity, and other non-criminal movements or behaviors that are simply part of our existence as living mobile human beings. ShotSpotter information is never dispositive and should be afforded no greater weight in analyzing the totality of the circumstances.

{¶ 26} Carter asserts that the trial court erred in concluding, "without citation to authority or accompanying analysis, that 'the ShotSpotter alerts system is not akin to an anonymous tip.' " According to Carter, a ShotSpotter alert is analogous to a police dispatch: the human dispatcher answering a citizen report does the same task as ShotSpotter, i.e., notifying officers to investigate information received. Carter argues that the reasonableness of the suspicion created thereby depends on the source of the tip,

and when the source is unknown or unverifiable, it is " 'anonymous' and requires verification." Carter contends that ShotSpotter should be treated the same as an anonymous tip and should require corroboration.

**{¶ 27}** Carter directs our attention to *In re D.W.,* 184 Ohio App.3d 627, 2009-Ohio-5406, 291 N.E.2d 1114 (2d Dist. 2009), *State v. Hairston,* 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132,[1] and *State v. Nimmer*, 395 Wis.2d 769, 954 N.W.2d 753 (2020). He argues that Erwin and Gallagher "relied entirely upon the alert received from ShotSpotter," without independent corroboration, which was required by the ShotSpotter policy (Exhibit 1). He contends that the ShotSpotter alert here was akin to an anonymous tip, which requires corroboration, citing *D.W.* at ¶ 17. According to Carter, "the mere report or hearing of gunshots in an area, while indicating the possibility of criminality afoot broadly, does not raise any individualized suspicion" that a particular person in that area is engaged in wrongdoing.

---

[1] In *Hairston*, the Ohio Supreme Court stated in *Hairston*:

> Here, the cumulative facts support the conclusion that the officers had a reasonable suspicion to stop Hairston. First, Officer Moore personally heard the sound of gunshots—the gunshots were not faint and sounded close-by. This is not a case in which the officers relied on a radio dispatch or other secondhand information about shots being fired, *e.g.*, *In re D.W.*, 184 Ohio App.3d 627, 2009-Ohio-5406, 921 N.E.2d 1114, ¶ 32 (2d Dist.), but one in which they heard and immediately reacted to the sound of nearby gunfire.

> Second, Officer Moore knew from personal experience that crime often occurred at night in the area where the stop took place. Officer Moore had worked the same beat for six years. He was familiar with drug and other criminal activity near the school, and he had made arrests for illegal weapons and other crimes there in the past. An officer's experience with criminal activity in an area and an area's reputation for criminal activity are factors we have found relevant to the reasonable-suspicion analysis. *Andrews* at 88, 565 N.E.2d 1271; *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988). Further, the stop occurred after dark—another circumstance we have found to be of some significance in the reasonable-suspicion analysis. *Bobo* at 179, 524 N.E.2d 489.

*Id.* at ¶ 11-12.

{¶ 28} Carter asserts that his mere presence in the area was not enough to establish reasonable suspicion, and that "anything could have happened" in the intervening minutes. According to Carter, he "was merely walking casually down the street four minutes after gunfire was purportedly detected," but the officers did not explore the surrounding area, and the fact that he was the only person in the area did not create reasonable suspicion. He asserts that, as in *D.W.*, which involved a report of shots fired, the officers had nothing except the "tip" to permit the stop and frisk of Carter. Moreover, the officer in *D.W.* responded within seconds, rather than minutes, as here.

{¶ 29} Finally, Carter cautions that ShotSpotter technology should not be allowed to "usurp" and "displace" the warrant requirement of the Fourth Amendment by allowing a broad exception to the warrant requirement based on an individual's presence in a particular area.

{¶ 30} In response, the State asserts that the trial court's findings of fact were supported by competent, credible evidence and that the officers had reasonable articulable suspicion to conduct a lawful pat down, which led to the discovery of the drugs. The State also points out that Carter did not object to evidence about ShotSpotter in the trial court, and that if Carter intended to challenge the reliability of the ShotSpotter evidence, he could have raised it or filed for a hearing pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) in the trial court. The State asserts that Carter cannot argue for the first time on appeal that the State failed to present evidence on the reliability of ShotSpotter. The State also asserts that the rules of evidence do not apply at a motion to suppress hearing, and there was no requirement that the State provide any foundation as to the efficacy of the ShotSpotter

alert when that issue was not raised in the motion to suppress. The State argues that "the officers provided a foundation that they were familiar with ShotSpotter, that they have responded to ShotSpotter alerts in the past, and that in some of those instances they have recovered firearms."

{¶ 31} The State contends the ShotSpotter is similar "to an identified citizen informant"; the ShotSpotter system records the sounds so that law enforcement can go back and listen to the recording of the shot(s) fired, an identifiable person at the ShotSpotter center analyzes the audio data and recording to confirm the gunfire prior to sending an alert; and the alert is issued in direct response to an emergency situation of shots fired. According to the State, a ShotSpotter alert "has an indicia of reliability upon which the police can reasonable rely," and "the categorization of the informant does not by itself determine whether the police had reasonable suspicion to stop Carter as it is just one element in the totality of the circumstances." According to the State, based upon the totality of the information known to officers at the time, it was reasonable for the officers to respond to the alert with the belief that a shot had been fired in the area of 59 Cambridge Avenue.

{¶ 32} The State further contends that the trial court's finding that Carter was observed walking away from the address identified by ShotSpotter was supported by the record: when the officers first observed Carter, he was walking on the same side of the road as 59 Cambridge Avenue, away from that address. In other words, the State asserts that Carter was approximately 50 feet away from 59 Cambridge Avenue and, therefore, was within the 82-foot radius of the ShotSpotter alert.

{¶ 33} The State argues that it was reasonable for the trial court to credit the

officers' testimony that Carter "canted away" from them and that the officers thought it was reasonable to conduct a pat down for weapons under the circumstances presented. According to the State, upon observing Carter walking alone in the dark within the ShotSpotter radius, the officers stopped their cruiser in the street but "made no show of authority"; they did not have their lights or sirens on and did not block Carter's path or physically restrained him in any way. Rather, the officers "initiated a casual conversation with Carter" while standing outside their cruiser, as he remained on the sidewalk. The State asserts that Gallaher was on the driver's side of the cruiser, 40-50 feet away from Carter, while Erwin was on the passenger's side, 20 feet from Carter. After this initial contact began, the officers observed Carter acting nervously and moving in such a way that they could not see the right side of his body.

{¶ 34} The State asserts that the circumstances involved in the encounter created reasonable articulable suspicion to pat Carter down for weapons, and that decision to pat Carter down was "not based on a single determining factor, but rather the aggregate of all facts collectively." The State asserts that "*Terry* precludes the individual divide-and-conquer analysis" upon which Carter relies because the reasonable articulable suspicion analysis is based upon an aggregate of factors. The State directs our attention to *Hairston*.

{¶ 35} The State argues that under "the totality of the circumstances in this case, the officers had reasonable articulable suspicion to conduct a lawful pat down of Carter for weapons." Finally, the State asserts that the trial court correctly determined that the pat down did not exceed the scope of a lawful *Terry* pat down.

{¶ 36} In reply, Carter asserts that "waiver is not applicable" and the State's

argument regarding *Daubert* is "irrelevant" because "extending *Daubert* to a criminal Motion to Suppress does not comport with typical criminal discovery under Ohio Criminal Rule 16. * * * Motions to suppress are categorically different and lack the formalities of trial testimony under *Daubert."*

{¶ 37} Carter further argues that he did not waive his argument regarding the reliability of ShotSpotter by failing to object, because there "was never a practical opportunity" to object. According to Carter, "ShotSpotter technology is still new to the courts" and must be found to be reliable, but the trial court "implicitly and improperly took judicial notice of ShotSpotter's reliability," which was unsupported by the record. Carter argues that the issue of ShotSpotter's reliability was "a fundamental and overarching issue," that the trial court was obligated to make factual findings and conclusions of law based only upon proper and reliable evidence, and that the evidence here was "unreliable, suspect, or questionable."

{¶ 38} Carter asserts that the trial court weighed Carter's alleged canting "heavily against Carter and necessarily relied upon the corroborating testimony of Officer Gallagher. But, according to Carter, Gallagher's testimony did not corroborate Erwin's testimony about the canting and "reveals what really happened" in the case. Carter explains:

> * * * Ofc. Gallagher does not immediately testify to any "canting" behavior. This is important. If Carter were "canting" his body with such painstaking effort that a reasonable officer would suspect active concealment of contraband, then this unnatural physical movement by Mr. Carter would certainly raise alarm bells. A reasonable officer would focus

their immediate attention on the "canting." A reasonable officer would immediately recognize such conduct in the performance of their duties because, impliedly, "canting" is not a common or natural movement. Persons "cant" when they are actively concealing something. A reasonable officer would, therefore, attribute great significance to such evasive behavior. * * * Ofc. Gallagher's testimony leaves serious questions about whether Carter was canting his body. If Carter was not canting his body, reasonable suspicion is unsupported by the remaining facts and circumstances.

{¶ 39} Carter notes that, on direct examination, Gallagher made no reference to canting or having an obstructed view of Carter's body. However, upon re-direct examination, "the State extracted the well-rehearsed script of law enforcement" in which Gallagher "conveniently recalled additional and critical facts" related to the canting and Carter's nervous behavior. Carter asserts that, without Gallagher's timely recollection of "canting," the facts, factors, and circumstances relied upon to establish reasonable suspicion were doubtful. Carter asserts that because his "purported canting" was a critical and weighty factor to the trial court's factual findings and legal analysis, which should not have been credited, the remaining facts and the totality of the circumstances did not objectively support the existence of a reasonable suspicion.

{¶ 40} Finally, Carter asserts that the "facts of this case are broadly analogous to *Nimmer,* 395 Wis.2d 769, 954 N.W.2d 753, but "are less substantial" than those in *Nimmer,* so this Court should find that no reasonable suspicion existed at the time Carter was placed in investigatory detention.

**{¶ 41}** This Court has noted:

When reviewing a motion to suppress, we must accept the trial court's findings of fact, if they are supported by competent, credible evidence. *State v. Love*, 2d Dist. Montgomery No. 23902, 2011-Ohio-1287. In ruling on a motion to suppress, "the trial court assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1973). The credibility of the evidence was for the trial court to determine, because it heard the evidence directly. *State v. Olson,* 2d Dist. Montgomery No. 25452, 2013-Ohio-4403, ¶ 11, citing *State v. Myles,* 2d Dist. Montgomery No. 25297, 2013-Ohio-2227, ¶ 21.

"Accepting the findings of fact of the trial court as true, we must independently determine as a matter of law, whether the facts meet the appropriate legal standard." *State v. Love* at ¶ 19; *see also, State v. Mobley,* 2d Dist. Montgomery No. 26044, 2014-Ohio-4410, ¶ 11; *State v. Shipp*, 2d Dist. Montgomery No. 24933, 2012-Ohio-6189, ¶ 11; *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002-Ohio-268.

*State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 11-12 (2d Dist.).

**{¶ 42}** In *Millerton,* we further noted*:*

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures." *Terry v. Ohio,* 392

U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Not all interactions between citizens and the police, however, implicate the protections of the Fourth Amendment. *State v. Garrison,* 2d Dist. Montgomery No. 24857, 2012-Ohio-3846, ¶ 15.

The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or detention, and 3) an arrest. *State v. Jones,* 188 Ohio App.3d 628, 2010-Ohio-2854, 936 N.E.2d 529, ¶ 13 (10th Dist.).

During a consensual encounter, the officer and citizen can engage in conversation, and a person's voluntary statements may be used against him or her, as long as that the person knows that he or she is free to walk away and the police have not conveyed a message that compliance with their requests is required. *State v. Barton,* 2d Dist. Montgomery No. 21815, 2007-Ohio-2348, ¶ 14-15.

Investigatory detention, often referred to as a *Terry* stop, allows an officer to briefly stop and temporarily detain individuals in order to investigate possible criminal activity. *State v. Strozier,* 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304 (2d Dist.), citing *Terry v. Ohio.* An investigatory stop does not constitute an arrest or place the suspect in custody. *State v. Jones* at ¶ 16. It is well established that "[a]n individual is subject to an investigatory detention when, in view of all the circumstances surrounding the incident, by means of physical force or show of authority, a reasonable person would have believed that he was not free

to leave or is compelled to respond to questions." *State v. Love,* 2d Dist. Montgomery No. 23902, 2011-Ohio-1287, ¶ 18, quoting *In re D.W.,* 184 Ohio App.3d 627, 2009-Ohio-5406, 921 N.E.2d 1114, ¶ 13-15 (2d Dist.).

During a brief investigatory stop, without placing the suspect in custody or under arrest, an officer is entitled to ask questions to confirm his suspicions that criminal activity occurred. During a *Terry* stop, an officer can ask for identification or sufficient information to write a citation or to run a background check for outstanding warrants, often called a "field investigation". *State v. Wortham,* 145 Ohio App.3d 126, 761 N.E.2d 1151 (2d Dist.2001). *See also, State v. Harrison,* 2d Dist. Montgomery No. 25128, 2013-Ohio-1235.

Also, during a *Terry* stop, it is sometimes considered reasonable for the investigating officer to conduct a "protective search" by patting down the suspect to discover and remove weapons. *State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762 (1997); *State v. Andrews,* 57 Ohio St.3d 86, 89, 565 N.E.2d 1271, 1274 (1991). The primary purpose of a protective search and seizure is to assure public and officer safety. "Pursuant to *Terry,* police officers are allowed to perform limited protective searches for concealed weapons when the surrounding circumstances create a suspicion that an individual may be armed and dangerous." *State v. Harding,* 180 Ohio App.3d 497, 2009-Ohio-59, 905 N.E.2d 1289 (2d Dist.), *overruled on other grounds, State v. Gardner,* 2d Dist. Montgomery No. 24308, 2011-Ohio-5692.

"The authority to stop an individual does not necessarily equate to authority to search the individual." (Citations omitted.) *State v. Lovins,* 2d Dist. Montgomery No. 23530, 2010-Ohio-3916, ¶ 12. *See also, State v. Stewart,* 2d Dist. Montgomery No. 19961, 2004-Ohio-1319, ¶ 16; *State v. Byrd,* 2d Dist. Montgomery No. 24583, 2012-Ohio-2659. Once a lawful stop has been made, the police may conduct a limited protective search for concealed weapons if the officer reasonably believes that the suspect may be armed or a danger to the officer or to others. *State v. Evans,* 67 Ohio St.3d 405, 618 N.E.2d 162 (1993); *State v. Molette,* 2d Dist. Montgomery No. 19694, 2003-Ohio-5965, ¶ 13.

"The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *." *Evans,* 67 Ohio St.3d at 408, 618 N.E.2d 162, quoting *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *see also, State v. Olden,* 2d Dist. Montgomery No. 23137, 2010-Ohio-215, ¶ 25. In other words, "the protective pat down under *Terry* is limited in scope to its protective purpose and cannot be employed by the searching officer to search for evidence of crime." *State v. Holley,* 2d Dist. Montgomery No. 20371, 2004-Ohio-4264, ¶ 10.

"The frisk, or protective search, approved in *Terry* is limited in scope to a pat-down search for concealed weapons when the officer has a reasonable suspicion that the individual whose behavior he is investigating at close range may be armed and dangerous. While probable cause is not

required, the standard to perform a protective search, like the standard for an investigatory stop, is an objective one based on the totality of the circumstances. The rationale behind the protective search is to allow the officer to take reasonable precautions for his own safety in order to pursue his investigation without fear of violence." *State v. Andrews,* 57 Ohio St.3d 86, 89, 565 N.E.2d 1271, 1274 (1991).

*Millerton* at ¶ 19-27.

{¶ 43} As this Court further noted in *Millerton*:

A police officer may stop and detain a suspect when the officer has a reasonable and articulable suspicion that the suspect has committed a criminal offense. *State v. Regulus,* 2013-Ohio-507, 986 N.E.2d 1105, ¶ 10 (2d Dist.), citing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A court determines the existence of reasonable suspicion by evaluating the "totality of the circumstances." *State v. Love* at ¶ 18.

To evaluate the totality of the circumstances, the court must consider the individualized facts through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Vineyard,* 2d Dist. Montgomery No. 25854, 2014-Ohio-3846, ¶ 21. * * *

When examining an officer's actions at the time of the stop, the court must make an objective assessment of the officer's actions, and not focus subjectively on the officer's actual state of mind. *Dayton v. Erickson,* 76 Ohio St.3d 3, 6, 665 N.E.2d 1091, 1097 (1996). * * *

*Id.* at ¶ 14 -16.

**{¶ 44}** This Court has also noted:

Because a frisk under *Terry* is justified "solely by 'the protection of the police officer or others nearby, * * * it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.' " *State v. Woodward* (Feb. 22, 2002), Montgomery App. No. 18869, 2002 WL 272602, quoting *Terry,* 392 U.S. at 29, 88 S.Ct. 1868, 20 L.Ed.2d 889. " 'The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.' " *State v. Dickerson,* Montgomery App. No. 22452, 2008-Ohio-6544, ¶ 19, quoting *Adams v. Williams* (1972), 407 U.S. 143, 145-146, 92 S.Ct. 1921, 32 L.Ed.2d 612.

* * * Under the plain-feel doctrine, an officer conducting a pat-down for weapons may lawfully seize an object if he has probable cause to believe that the item is contraband. *Minnesota v. Dickerson* (1993), 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334; *State v. Phillips,* 155 Ohio App.3d 149, 2003-Ohio-5742, 799 N.E.2d 653, ¶ 41-42. The "incriminating character" of the object must be "immediately apparent." [*Id.*] The officers may not manipulate the object to determine its incriminating nature. [*Id.*]

*State v. Lawson*, 180 Ohio App.3d 516, 2009-Ohio-62, 906 N.E.2d 443, ¶ 24-25 (2d Dist.).

**{¶ 45}** "Whether there is a constitutional basis to conduct a pat down during a *Terry* stop is a question of law which we review on a de novo basis; however, our review is based on the trial court's findings of fact." *Millerton* at ¶ 17.

{¶ 46} In *Nimmer*, which Carter cites, the defendant pled guilty after the trial court denied his motion to suppress evidence of a handgun found in his possession when he was stopped and frisked by police investigating a ShotSpotter alert. *Id.* at ¶ 1. Officers in *Nimmer* received a ShotSpotter alert of four gun shots at 10:06 p.m. in the city of Milwaukee. *Id.* at ¶ 2. After a short drive, officers "observed Nimmer about 100 feet from the location of the ShotSpotter alert, with his hand in his right pocket. The officers stated that when Nimmer saw the squad car, he looked away and began walking faster." *Id.* at ¶ 3. "The officers exited their squad and approached Nimmer, who then reached for his left side and 'bladed' his left side away from the officers." *Id.* at ¶ 4. One of the officers then patted down Nimmer, who told the officer "the gun's on my waistline bro." A Smith & Wesson .40 caliber handgun was found concealed in the waistband of Nimmer's pants, under his t-shirt. *Id.*

{¶ 47} The Wisconsin Court of Appeals reversed the trial court based on the denial of the motion to suppress. The Court of Appeals noted that the articulable facts, as explained by one of the officers and considered by the trial court, were that (1) there had been a ShotSpotter alert; (2) the officers saw Nimmer in the area of that alert immediately following the alert; and (3) when Nimmer saw the squad car, he "bladed" and accelerated his walking pace. *Id.* at ¶ 15. In determining that reasonable articulable suspicion was lacking, the appellate court undertook the following analysis

> First, we note that the facts of this case are very similar to a relatively recent unpublished decision of this court, *State v. Lewis*, No. 2017AP234-CR, unpublished slip op. (WI App July 25, 2017). In *Lewis*, the defendant was stopped by police officers investigating a report of shots fired. *Id.*, ¶2.

The basis for the stop was that the defendant was walking in the general area of the shots fired report with his hand on the waistband of his pants. *Id.* When the officers stopped him, he admitted that he was carrying a concealed weapon without a permit. *Id.*

The State in *Lewis* conceded that these were not sufficient articulable facts to establish reasonable suspicion for the stop, and the trial court's denial of Lewis's motion to suppress was reversed. *Id.*, ¶¶ 6, 8. The State's concession was based in part on the similarity of those facts to the facts in *State v. Gordon*, 2014 WI App 44, 353 Wis. 2d 468, 846 N.W.2d 483. *See Lewis*, 2017AP234-CR, ¶4. In *Gordon*, this court reversed the trial court's denial of a motion to suppress evidence that was seized from the defendant. *See id.*, 353 Wis. 2d 468, ¶1. The officers had stopped Gordon because he was walking in "one of the more dangerous areas of the district" that they patrolled, and because he had done a "security adjustment"—a "conscious or unconscious movement," such as touching a pants pocket, which is sometimes done by an individual who is carrying a weapon when approached by law enforcement. *Id.*, ¶¶3-4.

We noted that "sadly, many, many folks, innocent of any crime, are by circumstances forced to live in areas that are not safe," and further, that "many folks, most innocent of any nefarious purpose, may occasionally pat the outside of their clothing to ensure that they have not lost their possessions." *Id.*, ¶¶15, 17. We therefore concluded that "[p]ermitting *Terry* stops of persons momentarily patting the outside of their clothing

when the *only* additional facts are that those persons are in a high crime area and have seen a cruising police car would expand the individualized reasonable suspicion requirement so far so as to negate it." *Id.*, ¶18 (internal quotation marks omitted).

This court reached a comparable conclusion on similar facts in *State v. Pugh*, 2013 WI App 12, 345 Wis. 2d 832, 826 N.W.2d 418, a case cited by Nimmer in support of his argument. In *Pugh*, officers were patrolling an area where there was a vacant building known to be a drug house. *Id.*, ¶4. They observed the defendant when he was "five-to-ten feet from two cars that were parked below a no-parking sign" at the back of that vacant building. *Id.*, ¶3. The defendant admitted that one of the cars parked under the no-parking sign was his. *Id.*, ¶4. However, the officers did not give the defendant a citation related to the parking matter; instead, they asked him "if he had anything illegal on his person," based on the fact that the defendant had "bladed" his right side away from the officers. *Id.*, ¶6. The defendant admitted that he had a gun in his possession, and he was charged with being a felon in possession of a firearm. *Id.*, ¶¶1, 6. His motion to suppress the gun evidence was denied, and he pled guilty to the charge. *Id.*, ¶1.

This court reversed that decision. *Id.*, ¶13. In doing so, we noted that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.*, ¶12 (citation omitted;

brackets in *Pugh*).    Furthermore, the officers who arrested Pugh had stated that he had bladed away from them when he took a couple steps back away from them.    *Id.*    We asked how a person walks away from another—as Pugh had the right to do at that point—without "turning his or her body to some degree," and stated that "[c]alling a movement that would accompany *any* walking away 'blading' adds nothing to the calculus except a false patina of objectivity."    *Id.*

There is, however, a distinguishing factor between *Pugh*, as well as *Gordon*, and this case, along with *Lewis*: in this case and in *Lewis*, the officers were investigating a report of shots fired, where in *Pugh* and *Gordon*, the officers were simply on routine patrol in a "dangerous" area. In fact, the officers responding to a shots fired report was the key factor in the trial court's decision here: "anyone that they encountered within a minute or two of receiving the alert should have been investigated if they were within a couple of blocks of the alleged shots being fired."    Further discussion of this distinguishing factor, therefore, is prudent for this analysis.

That leads us to *State v. Washington*, 2005 WI App 123, 284 Wis. 2d 456, 700 N.W.2d 305, also cited by Nimmer.    In *Washington*, officers were "investigat[ing] a complaint of loitering and drug sales at an allegedly vacant house."    *Id.*, ¶2.    The officers saw the defendant in front of that house, and recognized him from previous encounters relating to narcotics sales.    *Id.*, ¶¶2, 3.    The officers ordered the defendant to stop; he did, but then backed up a few steps at which time a towel flew out of his hand which contained

cocaine. *Id.*, ¶2. He was charged with possession of cocaine with intent to deliver. *Id.*

The officers claimed that they had initially stopped the defendant with the intent to charge him with loitering. *Id.*, ¶3. At a suppression motion hearing on the issue, however, the trial court stated that no proof had been submitted that the loitering ordinance had been violated. *Id.*, ¶7. Nevertheless, the court ultimately found that although the officers did not have reasonable suspicion for the initial stop of the defendant, after he had "thrown the drugs away," the officers had probable cause to arrest him. *Id.*

This court reversed that decision, concluding that the drugs had been recovered as the result of an unreasonable stop and illegal seizure. *Id.*, ¶19. We stated that the officers did not have reasonable suspicion to initially stop the defendant, noting that there was nothing in the record to support the officer's statement that they were going to cite him for loitering. *Id.*, ¶17. We further concluded that even the defendant's known prior convictions for selling drugs and his location in front of a known drug house "[did] not supply the requisite reasonable suspicion for a valid investigatory stop." *Id.* Additionally, we noted that the defendant had not attempted to flee, even though he had taken a couple of steps backwards after being ordered by the officers to stop. *Id.*, ¶18.

From *Washington*, we take away the principle that when officers are investigating a specific crime, the mere presence of an individual in the area where that crime is suspected of having been committed—even if the

individual is known to have previously committed a related crime—is still not sufficient to meet the reasonable suspicion standard. *See id.*, ¶17. In fact, we observed that "[p]eople, even convicted felons, have a right to walk down the street without being subjected to unjustified police stops." *Id.*

The common thread in all of these cases is that the facts articulated by the police officers involved were deemed to be insufficient to support a finding of reasonable suspicion. With that being said, we cannot help but wonder—even while recognizing that police officers must make split-second decisions under circumstances where all factors may not be known— whether in response to these decisions, officers have sought to find "magic" language for their articulated facts to describe a person's behavior to overcome the problems identified in these decisions.

For example, we know from the cases discussed above that Nimmer's mere presence in an area where criminal activity is suspected is not sufficient to meet the standard for reasonable suspicion. *See id.*;*see also Pugh*, 345 Wis. 2d 832, ¶12. However, Officer Milone further testified that Nimmer also accelerated his walking pace upon seeing the squad. The officer explained that this may have been "an attempt to maybe run from police."

We are not swayed by this additional factor. Although we have previously recognized that "flight or attempted flight," together with other factors, may be sufficient to support a finding of reasonable suspicion, *see Gordon*, 353 Wis. 2d 468, ¶17, increasing one's walking pace is not the

equivalent of fleeing the scene. *See Young*, 294 Wis. 2d 1, ¶73 (where our supreme court acknowledged that "people may have the right to disregard the police and walk away without giving rise to reasonable suspicion"). Furthermore, the indeterminate nature of the officer's testimony here is comparable to a "mere hunch," which is insufficient for finding reasonable suspicion. *See id.*, ¶21.

Additionally, we know that Nimmer's purported blading away from Officer Milone as he walked is likewise insufficient to support reasonable suspicion. *See Pugh*, 345 Wis. 2d 832, ¶12. However, Officer Milone testified that Nimmer was also "digging around" in his pockets as he walked. We know from *Gordon* that a "security adjustment"—in that case, touching the outside of a pants pocket—is insufficient to demonstrate reasonable suspicion. *See id.*, 353 Wis. 2d 468, ¶¶4, 17. Similarly, we know from *Lewis* that "holding the waistband" of one's pants is also insufficient. *See id.*, 2017AP234-CR, ¶¶2, 8. Even knowing that weapons are often found in both pockets and in the waistband of pants—Nimmer's weapon was discovered in his waistband—we refused in both of those cases to presume that observing an individual's hand in either of those places is necessarily indicative of a "nefarious purpose[.]" *See id.*; *Gordon*, 353 Wis. 2d 468, ¶17. We decline to do it here as well, despite the added descriptor of "digging around" in his pocket.

Therefore, we conclude that, even taken together, these facts do not support a finding that the officers had reasonable suspicion to stop and frisk

Nimmer. Furthermore, the standard employed by the trial court here—that anyone the officers encountered "within a minute or two of receiving the alert should have been investigated if they were within a couple of blocks of the alleged shots being fired"—is simply too broad to fit within the confines of Fourth Amendment law regarding stop and frisk procedures. Accordingly, we reverse the trial court's order denying Nimmer's motion to suppress, and remand this matter with instructions to enter an order granting his motion.

(Footnote omitted.) *Id.* at ¶ 16-30.

{¶ 48} In *State v. Rickmon*, 952 F.3d 876 (7th Cir. 2020), the Seventh Circuit Court of Appeals, as a matter of first impression, considered "whether law enforcement may constitutionally stop a vehicle because, among other articulable facts, it was emerging from the source of a ShotSpotter alert. The district court held that the totality of the circumstances provided the officer responding to the scene with reasonable suspicion of criminal activity to justify the stop," and the Seventh Circuit affirmed. *Id.* at 878.

{¶ 49} In considering reasonable suspicion, the court noted as follows:

"While 'inarticulate hunches' are not enough, 'reasonable suspicion is a lower threshold than probable cause' and 'considerably less than preponderance of the evidence.' " *United States v. Adair*, 925 F.3d 931, 935 (7th Cir. 2019) (citations omitted). Our task is to objectively examine the "totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *Id.* (citation omitted). We are mindful that "[r]easonable

suspicion is a 'commonsense, non-technical' concept that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *United States v. Wanjiku*, 919 F.3d 472, 488 (7th Cir. 2019) (citation omitted).

*Id.* at 881.

{¶ 50} At the suppression hearing in *Rickmon*, Officer Ellefritz stated "that he had no reason to suspect that any weapons used in the shooting were in this car. He explained that the occupants were not attempting to flee, they complied with his commands, and they neither moved suspiciously nor gestured threateningly." *Id.* at 880. "In sum, there was nothing particularly unusual about this car, except for the fact that it was leaving the area of the gunfire." *Id.*

{¶ 51} The Seventh Circuit determined that "the totality of the circumstances establishes the officer stopped the car for more reasons than just its location in ShotSpotter's coverage zone." *Id.* at 881. In so concluding, the Seventh Circuit applied the following factors: "(1) the reliability of any reports to police; (2) the dangerousness of the crime; (3) the temporal and physical proximity of the stop to the crime; (4) any description of the vehicle and relevant traffic; and (5) the officer's (or potentially even the department's) experience with criminal activity in that area. * * *." *Id.* at 881-882."

{¶ 52} First, the court concluded (unlike the trial court herein) that a ShotSpotter alert "is analogous to an anonymous tipster. So, what Officer Ellefritz ends up with is an anonymous tip from ShotSpotter that the 911 calls then independently confirmed." *Id.* at 882. Second, it was significant to the court that Ellefritz "was responding to an emergency report of shots fired, not one of general criminality. We have repeatedly

emphasized in our decisions that the inherent danger of gun violence sets shootings apart from other criminal activity." *Id.* at 883. Third, "Ellefritz encountered Rickmon's vehicle on the same block of the shooting five-and-a-half minutes after he received reports of shots fired." *Id.* The court noted that "it was rational for Officer Ellefritz to infer that Rickmon's car participated in the gunfight because it was the only vehicle on the street of the shooting." *Id.* at 884. Fourth, "Ellefritz did not have the description of any vehicle; however, it was 4:45 a.m. and there was no other traffic. Again, in such a scenario, "[t]he hour reinforce[s] the suspicion" because we realistically expect few people on the road at that time." *Id.* at 884. According to the Seventh District, "it was reasonable—not random—to pull Rickmon over." *Id.* Finally, the court noted that Ellefritz had previously responded to the area on reports of shots fired. *Id.*

**{¶ 53}** The Seventh District concluded as follows:

Altogether, the circumstances here—the reliability of the police reports, the dangerousness of the crime, the stop's temporal and physical proximity to the shots, the light traffic late at night, and the officer's experience with gun violence in that area—provided reasonable suspicion to stop Rickmon's vehicle. As in similar past challenges to automobile seizures, "there is 'far more in this case ... than ... mere physical proximity' to the criminal activity." *Richards*, 719 F.3d at 758 (quoting *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir. 1992)); *see also Burgess*, 759 F.3d at 710. Multiple circumstances separate Rickmon's case from others. In isolation, any one of those circumstances might not be sufficient. But viewed collectively, they start to seem suspicious. "In such a situation, it is

reasonable for police to act quickly lest they lose the only opportunity they may have to solve a recent violent crime or to interrupt an advancing one."

*Burgess*, 759 F.3d at 711.

(Footnote omitted.) *Id.* at 884-885.

**{¶ 54}** In light of these discussions, we initially conclude that the issue herein is whether Erwin and Gallagher had reasonable suspicion to stop Carter and conduct the pat down, and we need not reach the scientific reliability of the ShotSpotter system. In this case, the ShotSpotter was primarily relevant to the officers' calculus in making the stop. We so conclude because Carter did not challenge the scientific reliability of the ShotSpotter system with particularity in his motion to suppress, request a *Daubert/*expert testimony hearing to do so, or object to the officers testimony regarding ShotSpotter. Moreover, as the parties agree, the Rules of Evidence do not apply to suppression hearings. *State v. Kinn,* 2d Dist. Montgomery No. 28336, 2020-Ohio-512, ¶ 11. We further conclude that the officers herein had reasonable articulable suspicion to execute a *Terry* stop and pat Carter down for weapons. Under the totality of the circumstance, we disagree with Carter's assertion that the trial court afforded the ShotSpotter alert dispositive weight. Furthermore, there is no evidence in this record that this was a non-consensual encounter.

**{¶ 55}** While there were no separate 911 calls reporting gunfire or any additional information in terms of a suspect, Erwin and Gallagher were responding to an alert of shots fired, an inherently dangerous circumstance beyond general criminality. In their experience, they had recovered weapons in response to ShotSpotter alerts. Carter was observed within four minutes of the officers receiving the alert within the specific area of

the alert. In other words, as in *Rickmon*, the stop had temporal and physical proximity to the gunfire. It was almost 1:00 a.m., dark out, and Carter was the only person observed within the range of the alert. While *Nimmer* was observed at 10:06 p.m., when people may more commonly be up and about, in this case, as in *Rickmon*, the early morning hour supported the officers' reasonable suspicion. We further conclude that it was not random to initiate the *Terry* stop, and it was reasonable for the officers to act quickly. Erwin testified that the officers "believed [Carter] could have possibly been the shooter, or shot someone, shot at a house or something, so that's what * * * made us stop and talk to him." Gallagher stated that due "to the likelihood of him being in the area at that time of a Shotspotter, likelihood of him having a firearm, I thought it was a safety issue, so I wanted to perform a pat down." We do not agree, as Carter suggests, that the officers used "magic" words or language in testifying to establish reasonable suspicion. The court clearly found the officers' testimony to be credible, and we defer to the court's credibility assessment. Based upon the officers' testimony, we agree with the trial court's determination that they were justified in their belief that Carter was "armed and presently dangerous" and "in the belief that [officer] safety or that [of] others was in danger."

{¶ 56} Carter's demeanor at the time further supported the officers' suspicion. While he was merely walking down the sidewalk, both officers clearly testified that he canted his body in such a manner that they were unable to observe his right side. This canting behavior is distinct from the blading behavior discussed in *Nimmer,* as Carter was not walking away from the officers at the time but was walking toward them, and we conclude that Carter's canting supported reasonable suspicion. Erwin stated that the

canting was notable because people often tuck firearms in their waistband or pockets, and Gallagher stated that canting is "a nervous tendency that he might be trying to conceal something, which is another reason for the pat down." Gallagher described Carter as nervous and shaky, and while Carter advised that he had been to the home of a friend, he was unable to provide the friend's name. We note that Gallagher's detailed description of the pat down reflects that he was searching for weapons and not drugs. He stated that the methamphetamine was "sticking right out" of Carter's mesh shorts, and we conclude that Gallagher did not exceed the scope of *Terry*. Based upon the totality of the circumstances, we conclude that the officers' reasonable articulable suspicion justified the *Terry* stop and ensuing pat down, and that Gallagher lawfully seized the methamphetamine. Accordingly, Carter's first assignment of error is overruled.

{¶ 57} Carter's second assignment of error states:

THE APPELLANT WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL PURSUANT TO ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

{¶ 58} Carter asserts that he was not advised or aware that a plea and subsequent conviction in this case carried a mandatory term of imprisonment of at least two years. Carter makes this claim despite the Crim.R. 11 plea colloquy with the trial court; however, counsel herein asserts that Carter's claim that he was not adequately advised of the penalties involved discussions prior to his no contest plea. Accordingly, his plea was not made knowingly, intelligently, or voluntarily as a result of ineffective assistance of trial counsel.

**{¶ 59}** The State responds that Carter failed to comply with App.R. 16(A)(7) in supporting his claims and, furthermore, that the record does not support Carter's contentions. According to the State, "even assuming that counsel's performance was professionally unreasonable, an error by counsel does not warrant setting aside a criminal conviction if the error had no effect on the judgment." The State argues that at no time during the plea colloquy did Carter indicate that he had never been informed of the mandatory nature of the sentence or that it carried a mandatory minimum sentence of two years. The State also points out that the trial court advised Carter of the mandatory nature of his sentence, and the information was contained in the plea form. Thus, the State argues that the record affirmatively indicates that Carter understood the entirety of the plea when he entered it on the record in open court.

**{¶ 60}** This Court has noted that:

> In order to succeed on an ineffective assistance claim, a defendant must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Strickland* at 688; *Bradley* at 142. To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892

N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

*State v. Whaley*, 2d Dist. Montgomery 2020-CA-15, 2021-Ohio-1434, ¶ 14.

{¶ 61} App.R. 16(A)(7) provides that an appellant's brief shall include the following: "An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, *with citations to the authorities, statutes,* and parts of the record on which appellant relies." Carter cites to no authority in his second assignment of error.

{¶ 62} We conclude that ineffective assistance is not demonstrated. At Carter's plea hearing, after defense counsel indicated that Carter would enter a no contest plea, the court indicated, "It's my understanding there's no agreement as to sentence * * * And it is a mandatory sentence, though." The parties acknowledged their understanding of the nature of the sentence.

{¶ 63} The court ascertained that Carter was 36 years old, had a college degree, and was able to read and comprehend the plea form. Carter indicated that he was not under the influence of any drugs or alcohol. The following exchange occurred:

THE COURT: Sir, in this case, you're entering a no-contest plea to one count of aggravated possession of drugs, a felony of the second degree. Do you understand that as a result of that plea, the Court could sentence you to financial sanctions, including a fine of up to $15,000, and a mandatory fine of between $7,500 and $15,000, and *a prison term of a*

*minimum sentence of 2 years and a maximum sentence of 8 years plus an additional one-half of the minimum sentence, for a total possible prison sentence of 12 years.*[2]

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  In addition, sir, *the prison term for aggravated possession of drugs, a felony of the second degree, is mandatory and cannot be reduced by earned credit, judicial release, or furlough.*

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

* * *

THE COURT:  So do you understand, sir, the minimum prison sentence is two years, but the minimum is anywhere between two years and eight years, and the maximum sentence will be one-half of the minimum sentence.  So if, for instance - - I'm purely doing this by way of example - -

---

[2] R.C. 2929.14 governs prison terms, and R.C. 2929.14(A)(2)(a) provides: "For a felony of the second degree committed on or after the effective date of this amendment, the prison term shall be an indefinite prison term with a stated minimum term selected by the court of two, three, four, five, six, seven, or eight years and a maximum term that is determined pursuant to section 2929.144 of the Revised Code, except that if the section that criminalizes the conduct constituting the felony specifies a different minimum term or penalty for the offense, the specific language of that section shall control in determining the minimum term or otherwise sentencing the offender but the minimum term or sentence imposed under that specific language shall be considered for purposes of the Revised Code as if it had been imposed under this division."  R.C. 2929.144(B)(1) provides: "If the offender is being sentenced for one felony and the felony is a qualifying felony of the first or second degree, the maximum prison term shall be equal to the minimum term imposed on the offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code plus fifty per cent of that term."

if you were sentenced to four years, then the minimum sentence is four years and the maximum is six years. * * * And your release from prison would be determined by the parole board anywhere between four years and six years. Do you understand that?

THE DEFENDANT: Yes, Your Honor.

{¶ 64} The court advised Carter of the constitutional rights his plea would waive. Carter acknowledged that he had had the opportunity to discuss his plea with counsel, that he was satisfied with counsel's representation, and that he entered his plea voluntarily. When asked if he had any questions prior to entering his plea, Carter responded, "No, Your Honor." Carter's plea form provided that "the prison term(s) for Aggravated Possession of drugs is/are mandatory and cannot be reduced by judicial release, earned credit, or furlough."

{¶ 65} We conclude that ineffective assistance is not demonstrated. Not only does Carter fail to direct our attention to any authority in support of his argument, the record before us belies his assertion that "he was not advised or aware that a plea and subsequent conviction in this case carried a mandatory term of imprisonment of at least two years." The trial court advised Carter of the mandatory nature of his sentence, and the minimum two-year term, and Carter does not delineate defense counsel's alleged ineffectiveness or demonstrate prejudice. Accordingly, Carter's second assignment of error is overruled.

{¶ 66} Having overruled Carter/s assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J., concurs.

TUCKER, P.J., concurs:

{¶ 67} The State does not argue that the ShotSpotter alert, standing alone, provided a reasonable, articulable suspicion that Carter was connected to the reported gunshot(s). Instead, the State argues that the initial encounter between Officers Erwin and Gallagher was consensual, and that, based upon the officers' observations following the initial encounter, the incident was converted into a constitutionally permissible investigative stop. The State then argues that there was a reasonable suspicion that Carter was armed and dangerous, which made the pat down search and then the plain feel discovery of the drugs at issue constitutionally appropriate. I agree with the State's arguments, and, on this basis, I concur in the majority opinion.

{¶ 68} I do not think, and, as just noted, the State does not assert, that a ShotSpotter alert, without more, provides a reasonable, articulable suspicion that a person found in or near the provided gunshot radius and otherwise acting innocuously is connected to the reported gunshot. *See Rickmon*, 952 F.3d at 881 (questioning whether a single ShotSpotter alert would amount to reasonable suspicion.).[3]

{¶ 69} This being said, good police work required Erwin and Gallagher to make contact with Carter in an attempt to initiate a consensual encounter. When an officer makes contact with a person in a public place, the officer engages that person in a conversation during which the officer solicits investigative information, but the person

---

[3] I do not rule out the possibility that, upon a better record regarding the reliability of ShotSpotter, a ShotSpotter report, without much more, could provide a reasonable suspicion to stop a person found in or near the gunshot radius.

remains free to ignore the officer and terminate the encounter; the contact is consensual and does not implicate the Fourth Amendment. *State v. Taylor*, 106 Ohio App.3d 741, 747, 667 N.E.2d 60 (2d Dist.1995), citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497. It is the State's burden to establish that at its inception an encounter is consensual. *State v. Crum*, 2d Dist. Montgomery No. 22812, 2009-Ohio-3012, ¶ 17. In contrast, a seizure occurs, and Fourth Amendment protections are triggered, when, under the totality of the circumstances, a "reasonable person would have believed that he was not free to leave or [was] compelled to respond to questions." *State v. Celaya*, 2d Dist. Montgomery No. 28177, 2019-Ohio-2747, ¶ 21, citing *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 22. Determining whether an encounter is consensual or is an investigative seizure is, obviously, "fact sensitive." *Id.* at ¶ 23.

{¶ 70} In this case, the State's suppression hearing argument was not that the initial encounter was consensual. And the trial court's decision was silent on this issue. Nonetheless, Erwin and Gallagher's testimony established that the officers stopped the cruiser and simply engaged Carter in conversation, and that Carter, without being compelled to do so, responded to the officers' inquiries. Thus, in my opinion, the encounter was consensual at its inception.

{¶ 71} The suppression hearing testimony further established that Carter was extremely nervous upon contact with the officers, was unable to identify the friend supposedly living at 55 Cambridge Avenue, and attempted to shield his right side from the officers' view. These factors, in conjunction with the ShotSpotter alert, were sufficient to convert the encounter into an investigative stop. Moreover, the ShotSpotter report

and Carter's efforts to shield his right side from the officers' observation provided a reasonable suspicion that Carter was armed and dangerous, making the pat down search appropriate. Finally, I agree with the majority opinion's plain feel analysis. In short, though my reasoning is different, I concur in the majority opinion's conclusion that the trial court's judgment should be affirmed.


Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Matthew M. Suellentrop
Hon. Mary Katherine Huffman