# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP878-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, |
| |        Plaintiff-Respondent-Petitioner, |
| |    v. |
| | Avan Rondell Nimmer, |
| |        Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 395 Wis. 2d 769, 954 N.W.2d 753
(2021 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 23, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 25, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | Glenn H. Yamahiro |

JUSTICES:

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court with respect to all parts except ¶¶28, 29 n.12, and 39-58, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶28, 29 n.12, and 39-58, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. HAGEDORN, J., filed a concurring opinion.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Sarah L. Burgundy*, assistant attorney general, with whom on the briefs was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sonya K. Bice*, assistant attorney general.

For the defendant-appellant, there was a brief filed by *Mark S. Rosen* and *Rosen and Holzman*, Waukesha. There was an oral argument by *Mark S. Rosen*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP878-CR
(L.C. No. 2019CF2611)

STATE OF WISCONSIN     :     IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent-Petitioner,**

    **v.**

**Avan Rondell Nimmer,**

    **Defendant-Appellant.**

**FILED**

**JUN 23, 2022**

Sheila T. Reiff
Clerk of Supreme Court

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court with respect to all parts except ¶¶28, 29 n.12, and 39-58, in which ZIEGLER, C.J., ROGGENSACK, and HAGEDORN, JJ., joined, and an opinion with respect to ¶¶28, 29 n.12, and 39-58, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined. HAGEDORN, J., filed a concurring opinion.

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 REBECCA GRASSL BRADLEY, J. This case concerns police officers' ability to respond to concededly reliable reports of gunfire generated in near real-time. Two Milwaukee officers received such a report via a technology known as ShotSpotter. The officers arrived on scene no more than one minute after

receiving the report, seeing only one person there: Avan R. Nimmer. After noticing the squad car, Nimmer accelerated his pace away from it. He also dug around his left side with his left hand. Officer Anthony Milone stepped out of the squad car and walked toward Nimmer, who "bladed" his left side away from Milone while continuing to dig around his left side.[1] The officers considered these movements suspicious because they were consistent with actions a person may take in attempting to conceal a weapon. The officers stopped Nimmer to investigate whether he was involved in the shooting. Concerned for their safety, Milone frisked Nimmer and found a handgun.

¶2 Because Nimmer was a felon, the State charged him with being a felon in possession, in violation of Wis. Stat. § 941.29(1m)(a) (2019-20).[2] Nimmer moved to suppress any evidence obtained as a result of the investigative stop, including the handgun, arguing the stop violated his Fourth Amendment right against unreasonable seizure. The circuit court denied Nimmer's motion.[3] The court of appeals reversed in an unpublished per curiam decision. State v. Nimmer,

---

[1] "Blading" is a technique used to conceal a weapon. "[A] person carrying a gun . . . turn[s] 90 degrees away from the person observing or approaching, placing his body between the gun and the other person." Nathan C. Meehan & Christopher Strange, Behavioral Indicators of Legal and Illegal Gun Carrying 7 (2015).

[2] All subsequent references to the Wisconsin Statutes are to the 2019-20 version.

[3] The Honorable Glenn H. Yamahiro, Milwaukee County Circuit Court, presided.

No. 2020AP878-CR, unpublished slip op. (Wis. Ct. App. Dec. 15, 2020) (per curiam).

¶3 We hold the officers had reasonable suspicion, based on the totality of the circumstances, to believe Nimmer was involved in criminal activity. Accordingly, we reverse the decision of the court of appeals.

## I. BACKGROUND

### A. ShotSpotter

¶4 This case involves a relatively new technology, ShotSpotter. At the suppression hearing, Officer Milone testified ShotSpotter is a "gunshot location system." He explained it uses "acoustic sensors" to "record sounds to try to locate . . . gunfire." More specifically, "when the acoustic sensors pick-up the sounds of gunfire, [they] send[] an alert to an office in California. There is somebody standing by in the office who listens to the audio and . . . if it sounds like actual gunshots, they will send the alert[.]"[4] Nimmer has not argued the time that elapses between ShotSpotter detecting gunfire and notifying officers is sufficiently long to be a material fact.

¶5 Nimmer does not dispute ShotSpotter's reliability. Officer Milone testified at the suppression hearing, "I [have] responded to . . . over a thousand [ShotSpotter reports]. . . .

---

[4] Officer Milone indicated Milwaukee employs ShotSpotter at several locations: "There is ShotSpotters in multiple cities. So we get dealings for all of Milwaukee including not just District Five, but all of Milwaukee."

In my experience, [ShotSpotter] is pretty accurate." During oral argument before this court, when asked whether Nimmer was "challenging the reliability of ShotSpotter," Nimmer's attorney responded:

> No, . . . we are not. . . . [T]he thing is I think it's pretty clear about ShotSpotter technology, is I think it can say when and where. I think now it's gotten to the point where it can say what. It can distinguish between firecrackers. I think that's pretty clear. I'm not disputing that.

Despite ShotSpotter's reliability, Nimmer argues the officers lacked reasonable suspicion to believe he was involved in criminal activity.

### B. The Shooting Investigation

¶6 In the summer of 2019, Officer Milone and his partner were on patrol when, at approximately 10:06 p.m., they received a computerized ShotSpotter report in their squad car. It stated four shots had been fired about three blocks away from the officers' location. Nimmer described the reported location as "highly residential." The officers drove there without activating their squad car's siren or flashing red and blue lights.

¶7 Officer Milone had responded to many similar reports in the past. He was a nine-year police veteran assigned to the Violent Crimes Saturation Unit, and his "typical[]" duties included "respond[ing] to calls like ShotSpotter, shots fired, subject with gun, armed robbery, calls of that nature involving gun and gun violence." He testified when he responds to a ShotSpotter report, he looks for "[a]nybody who is shot, any

4

people who are shot, any potential suspects, anybody walking around still shooting, [and] any witnesses[.]" When he sees individuals near the reported location, he explained he "tr[ies] to see what their response is upon sight of police, see if they are shot, see if they take off running, see if they start grabbing any part of their clothing, any part of their body." Effectively, he watches for evasive or nervous behavior.

¶8 The officers arrived on scene no more than one minute after receiving the ShotSpotter report and encountered Nimmer. Officer Milone testified Nimmer was at "basically the exact location where the ShotSpotter came in." He further testified the officers did not see anyone else——only Nimmer.

¶9 Nimmer observed the squad car and immediately accelerated his pace away from it——in fact, he doubled his pace, according to Officer Milone. Milone worried Nimmer was trying to distance himself from the squad car because he was considering fleeing. Milone testified, "I have observed many times somebody begins to accelerate their walking pace right before going into a run from police." He also testified Nimmer "began digging around his left side with his left hand."

¶10 Officer Milone then stepped out of the squad car and approached Nimmer. Milone testified:

> As I was approaching him behind him, he began turning his left side away from me. So at that point his left side was more forward and I could only really see his right side. I could observe his left arm was still digging around. I was directly behind him on the sidewalk and his right hand was within view, but his left hand was not.

5

Milone used "blading" as shorthand for Nimmer's turning motion at other points in his testimony. When asked to define blading, he said, "[b]lading [i]s the term I use when I talk about [Nimmer] moving his left side away from me where I could only see his right side. That would have been the part where he was blading his body." From Nimmer's blading, Milone inferred, based on his training and experience, "[Nimmer] did not want me to be able to see his left side."

¶11 The officers then stopped Nimmer to investigate whether he had been involved in the shooting. Officer Milone testified he "conducted a pat-down of [Nimmer] for officer safety for any weapons." As Milone began, Nimmer said, "[t]he gun is in my waistband[.]" Milone then felt Nimmer's waistband, and on Nimmer's left side, concealed under his shirt, was a .40 caliber Smith & Wesson semiautomatic pistol.[5]

¶12 The State charged Nimmer with being a felon in possession. He had been previously convicted of possession with intent to deliver THC, in violation of Wis. Stat. § 961.41(1m)(h)1.

C. Nimmer's Suppression Motion

¶13 Nimmer moved to suppress any evidence obtained as a result of the investigative stop, including the handgun, arguing the stop was unsupported by reasonable suspicion that he was involved in criminal activity. He asserted the officers stopped

---

[5] The officers later found a .40 caliber casing nearby; however, because they located it after stopping Nimmer, the casing cannot enter into the reasonable suspicion analysis.

him because of his "mere presence" in the same "neighborhood" as the gunfire's reported location. Offering an alternative explanation for his presence at the scene, Nimmer argued he could have been an innocent "pedestrian" out for a walk "on the street." Emphasizing the limits of ShotSpotter, Nimmer noted ShotSpotter does not provide a description of the shooter. It tells officers what, when, and where, but not who. Nimmer also asserted "even if" he made furtive movements, "standing alone" his acceleration away from the officers and his blading and digging could not give rise to reasonable suspicion. He also suggested these movements were not suspicious because "Nimmer couldn't have known necessarily that the squad car was a police car. It didn't have its red and blue lights on or the siren going. It was dark outside. The lights would prevent . . . Nimmer from being able to identify the squad as a squad car[.]"

¶14 The State countered the officers had reasonable suspicion because: (1) the officers arrived on scene almost immediately following the ShotSpotter report; (2) Nimmer was "in the close proximity of this call;" (3) the officers did not see anyone else near the reported location; and (4) Nimmer acted suspiciously once he noticed the officers.

¶15 The circuit court denied Nimmer's motion, agreeing with the State's argument. The court explained the "key" was "the timing" of events. It indicated its decision would be different if ShotSpotter did not work in near real-time and the officers arrived "10 or 15 minutes" after the reported shooting;

7

however, because only a nominal amount of time had passed, the court reasoned the officers could be suspicious of people at the scene.  It found Nimmer was "very close" to the gunfire's reported location, and Nimmer was the only person the officers saw.  Additionally, the court found Nimmer made furtive movements upon noticing the officers, which were "consistent with . . . trying to conceal a weapon."  Viewing all of these facts together, the court concluded the officers reasonably suspected Nimmer of criminal activity.

### D.  The Appeal

¶16  Nimmer entered into a plea agreement, pled guilty, and was sentenced to two years of initial confinement followed by two years of extended supervision.  Nimmer appealed.[6]  The court of appeals reversed the judgment of conviction and remanded the case to the circuit court, directing it to enter an order granting Nimmer's motion to suppress.  Nimmer, No. 2020AP878-CR, ¶30.

¶17  The court of appeals reasoned Nimmer's "mere presence" near "an area where criminal activity [was] suspected" was insufficient to give rise to reasonable suspicion that he was involved in criminal activity.  Id., ¶27 (citations omitted).  The court reached this conclusion by analogizing to four cases, only one of which involved a police response to reported

---

[6] Generally, a criminal defendant waives his right to appeal by pleading guilty; however, a narrow exception exists under Wis. Stat. § 971.31(10) for appeals challenging "[a]n order denying a motion to suppress evidence[.]"

8

gunfire. Those cases generally concern the weight a court may give to a person's presence at a location associated with criminal activity. State v. Gordon is illustrative. Id., ¶17 (quoting State v. Gordon, 2014 WI App 44, ¶¶3-4, 353 Wis. 2d 468, 846 N.W.2d 483). Officers stopped a suspect because he was walking in "one of the more dangerous areas of the district" and had been observed making a "security adjustment," i.e., a movement indicating he was carrying a weapon. Id. (quoting Gordon, 353 Wis. 2d 468, ¶¶3-4). The court of appeals concluded the officers lacked reasonable suspicion because a person's presence in a "high crime area" cannot be the primary fact supporting an investigative stop.[7] Id., ¶18 (quoting Gordon, 353 Wis. 2d 468, ¶18). By relying on Gordon and other like cases, the court of appeals ignored the timing of the officers' response to the report of gunfire, treating this case as if the officers merely noticed Nimmer in an area where they knew shootings often occurred instead of an area where a shooting reportedly just occurred.

¶18 Next, the court of appeals characterized Officer Milone's testimony about Nimmer's furtive movements as of an "indeterminate nature" seeming to question whether Milone's testimony was even truthful. Id., ¶28. Specifically, the court

---

[7] The other three cases cited by the court of appeals were: (1) State v. Pugh, 2013 WI App 12, 345 Wis. 2d 832, 826 N.W.2d 418; (2) State v. Washington, 2005 WI App 123, 284 Wis. 2d 456, 700 N.W.2d 305; and (3) State v. Lewis, No. 2017AP234-CR, unpublished slip op. (Wis. Ct. App. July 25, 2017).

speculated: "[W]e cannot help but wonder——even while recognizing that police officers must make split-second decisions under circumstances where all factors may not be known——whether . . . officers have sought to find 'magic' language for their articulated facts to describe a person's behavior to [justify an investigative stop]." Id., ¶26.

¶19 The court of appeals concluded Nimmer's presence near the gunfire's reported location, "even taken together" with Officer Milone's testimony regarding Nimmer's furtive movements, was insufficient to give rise to reasonable suspicion. Id., ¶30. While the court stated it considered the facts "together," it never analyzed the totality of the circumstances, instead addressing each fact in isolation.[8] The State filed a petition for review, which we granted.

## II. STANDARD OF REVIEW

¶20 This case presents a question of constitutional fact. See State v. Brown, 2020 WI 63, ¶8, 392 Wis. 2d 454, 945 N.W.2d 584 (citing State v. Smith, 2018 WI 2, ¶9, 379 Wis. 2d 86, 905 N.W.2d 353). We review the circuit court's findings of historical fact for clear error. Id. (quoting Smith, 379 Wis. 2d 86, ¶9). We independently apply the Fourth Amendment to the historical facts to determine whether the

---

[8] At oral argument, Nimmer's attorney acknowledged, while the court of appeals purported to consider the facts together, it "didn't explain anything further," i.e., it did not analyze the totality of the circumstances.

investigative stop was constitutional.[9]  Id. (quoting Smith, 379
Wis. 2d 86, ¶9).

### III.  DISCUSSION

### A.  Fourth Amendment Principles & Terry Stops

¶21 "The Fourth Amendment is 'indispensable to the full
enjoyment of the rights of personal security, personal liberty,
and private property.'"  Id., ¶9 (quoting 3 J. Story,
Commentaries on the Constitution of the United States § 1895
(1833)).  It states:

> The right of the people to be secure in their persons,
> houses, papers, and effects, against unreasonable
> searches and seizures, shall not be violated, and no
> Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly
> describing the place to be searched, and the persons
> or things to be seized.

U.S. Const. amend. IV.  "As the text makes clear, 'the Fourth
Amendment does not proscribe all state-initiated searches and
seizures; it merely proscribes those which are unreasonable.'"
State v. Coffee, 2020 WI 53, ¶22, 391 Wis. 2d 831, 943
N.W.2d 845 (lead opinion) (quoting State v. Tullberg, 2014 WI
134, ¶29, 359 Wis. 2d 421, 857 N.W.2d 120); see also Brown, 392

---

[9] The circuit court made a sweeping statement toward the end
of its remarks:  "Really, anyone that [the officers] encountered
within a minute or two of receiving the alert should have been
investigated if they were within a couple of blocks of the
alleged shots being fired."  The court of appeals concluded this
statement was "simply too broad to fit within the confines of
Fourth Amendment law regarding stop and frisk procedures."
State v. Nimmer, No. 2020AP878-CR, unpublished slip op., ¶30
(Wis. Ct. App. Dec. 15, 2020) (per curiam).  We agree; however,
notwithstanding this single stray comment, the circuit court
gave a thorough and well-reasoned explanation for its ruling.

Wis. 2d 454, ¶9 (quoting Riley v. California, 573 U.S. 373, 381 (2014)) ("[T]he [United States] Supreme Court repeatedly characterizes the reasonableness of searches and seizures as [the Fourth Amendment's] 'ultimate touchstone.'").

¶22 Generally, a search or seizure conducted without a warrant is "per se unreasonable[.]" Brown, 392 Wis. 2d 454, ¶10 (quoting Arizona v. Gant, 556 U.S. 332, 338 (2009)); State v. Matejka, 2001 WI 5, ¶17, 241 Wis. 2d 52, 621 N.W.2d 891 (citations omitted). However, ever since this nation's founding, there have been exceptions. Akhil Reed Amar, Terry and Fourth Amendment First Principles, 72 St. John's L. Rev. 1097, 1106 (1998) ("[A] large number of historical examples give the lie to the idea that warrants were always required at the Founding—warrantless arrests, searches incident to warrantless arrest, searches of ships, searches of liquor store-houses, border searches, successful seizures of contraband and stolen goods, and on and on.").

¶23 An officer may briefly stop an individual, without a warrant, if the officer has reasonable suspicion to believe the individual is involved in criminal activity. State v. Genous, 2021 WI 50, ¶7, 397 Wis. 2d 293, 961 N.W.2d 41 (quoting State v. Young, 2006 WI 98, ¶20, 294 Wis. 2d 1, 717 N.W.2d 729); State v. Anderson (Anderson I), 2019 WI 97, ¶32, 389 Wis. 2d 106, 935 N.W.2d 285. A short investigative stop is often called a "Terry

12

stop" based upon the United States Supreme Court decision Terry v. Ohio, 392 U.S. 1 (1968), which sanctioned them.[10]

¶24 Reasonable suspicion depends on the "totality of the circumstances." Genous, 397 Wis. 2d 293, ¶9 (citing State v. Post, 2007 WI 60, ¶18, 301 Wis. 2d 1, 733 N.W.2d 634). Just last term, we emphasized that "[w]e focus not on isolated, independent facts, but on 'the whole picture' viewed together." Id. (quoting United States v. Cortez, 449 U.S. 411, 417–18 (1981)). "Indeed, Terry itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation." Id. (quoting United States v. Sokolow, 490 U.S. 1, 9–10 (1989)). In this case, the court of appeals erred by utilizing a "divide-and-conquer analysis." See District of Columbia v. Wesby, 583 U.S. __, 138 S. Ct. 577, 588 (2018) (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)).

¶25 Reasonable suspicion is "a low bar[.]" Genous, 397 Wis. 2d 293, ¶8 (citing Young, 294 Wis. 2d 1, ¶21; State v. Eason, 2001 WI 98, ¶19, 245 Wis. 2d 206, 629 N.W.2d 625); see also Anderson I, 389 Wis. 2d 106, ¶33 ("Reasonable suspicion is a fairly low standard to meet." (citing Eason, 245 Wis. 2d 206,

---

[10] An officer may frisk a person during a Terry stop if the officer "reasonably believes" the individual is armed and poses a safety risk. State v. Young, 2006 WI 98, ¶55, 294 Wis. 2d 1, 717 N.W.2d 729 (citations omitted). Nimmer argues the officers lacked reasonable suspicion to believe he was involved in criminal activity, but does not challenge the legality of the search following the stop.

13

¶19)). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause[.]" Navarette v. California, 572 U.S. 393, 397 (2014) (internal citations and quotation marks removed). "[O]fficers are not required to rule out the possibility of innocent behavior before initiating a [Terry] stop." Genous, 397 Wis. 2d 293, ¶8 (quoting State v. Anderson (Anderson II), 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990)).

¶26 We must "consider everything observed by and known to the officer[s.]" Id., ¶10. Taking all of that information into account, we then determine whether the officers had "a particularized and objective basis" to reasonably suspect Nimmer of criminal activity. Brown, 392 Wis. 2d 454, ¶10 (quoting Navarette, 572 U.S. at 396). In other words, we must determine whether the officers had more than a "mere hunch" that Nimmer was involved in the shooting. Navarette, 572 U.S. at 397 (internal quotation removed).

### B. Application

¶27 Several facts known to the officers and accepted by the circuit court collectively give rise to reasonable suspicion that Nimmer was involved in criminal activity: (1) ShotSpotter generates reliable reports of gunfire in near real-time; (2) within a minute of receiving the ShotSpotter report, the officers arrived on scene; (3) Nimmer was at nearly the exact location where ShotSpotter reported gunfire; (4) Nimmer was the

14

only person the officers saw; and (5) Nimmer made furtive movements upon noticing the officers.

¶28 In addition, the criminal activity being investigated——a shooting in a highly residential area——supplemented the reasonableness of the officers' actions. See State v. Rutzinski, 2001 WI 22, ¶26, 241 Wis. 2d 729, 623 N.W.2d 516 ("[E]xigency can in some circumstances supplement the reliability of an informant's tip in order to form the basis for an investigative stop." (emphasis added) (citation omitted)); id., ¶35 ("In light of the potential for imminent danger that drunk drivers present, the informant's allegations suggesting that Rutzinski may have been intoxicated supplemented the reliability of the tip, and further justified Officer Sardina's investigative stop." (emphasis added)).

¶29 As the circuit court noted, the timing of events is key. The officers arrived shortly after receiving a reliable report of gunfire that was generated in near real-time, from which they could infer the shooter was likely nearby. Other courts have also concluded a relatively short period of time between officers receiving a ShotSpotter report and their arrival at the scene supports reasonable suspicion to stop and question those present. In United States v. Jones, officers arrived on scene within a minute and a half of receiving a dispatch that ShotSpotter had reported gunfire. 1 F.4th 50, 53 (D.C. Cir. 2021). After observing Jones walking quickly on an otherwise deserted block, the officers stopped him. The D.C. Circuit concluded reasonable suspicion to do so existed in large

15

part because the officers' rapid response significantly reduced the probability that the shooter had fled.[11] Id. In another analogous case, the Seventh Circuit concluded even five-and-a-half minutes was not "[a]s both a matter of fact and law . . . unduly long." United States v. Rickmon, 952 F.3d 876, 883 (7th Cir. 2020), cert. denied, 141 S. Ct. 2505 (2021). The Seventh Circuit determined reasonable suspicion exists to stop those present in the area within this timeframe because "[c]ommon sense counsels that a person may take minutes rather than seconds to flee for any number of reasons, including the destruction of evidence, an injury sustained in the shooting, or a need to hide in place."[12] Id. Relying on Rickmon, the Ohio

---

[11] The ShotSpotter report in United States v. Jones was not sent directly to the officers. The D.C. Circuit noted the record did not indicate how much time elapsed between the generation of the ShotSpotter report and its relay to officers. 1 F.4th 50, 53 n.2 (D.C. Cir. 2021). Contrary to Justice Dallet's assertion, the period of time necessary to generate a ShotSpotter report has not played a significant role in most cases discussing ShotSpotter. See Justice Dallet's Concurrence, ¶66 & n.6.

[12] In United States v. Rickmon, officers received two ShotSpotter reports and two dispatches reporting gunfire, which were based on 911 calls. 952 F.3d 876, 882 (7th Cir. 2020), cert. denied, 141 S. Ct. 2505 (2021). The Seventh Circuit reasoned a ShotSpotter report is at least as reliable as an anonymous tip. See id. at 879 n.2, 882. It then noted the "anonymous tip from ShotSpotter" was "independently confirmed" by the 911 calls relayed through the dispatches. Id. at 882. Analogizing a ShotSpotter report to an anonymous tip is part of the analysis, not a "sidetrack" from it. See Justice Dallet's Concurrence, ¶71 ("The majority/lead opinion gets similarly sidetracked by focusing on cases that have relaxed the usual corroboration requirements for anonymous tips when the police are responding to a potential emergency.").

16

Court of Appeals recently concluded reasonable suspicion existed in an analogous case involving approximately a four-minute police response time. State v. Carter, 183 N.E.3d 611, 629 (Ohio Ct. App. 2022).

¶30 The reasoning of Jones and Rickmon applies to this case. Given the officers' quick response and in light of their observations upon arrival, they could reasonably suspect Nimmer was the shooter and that he had not left the scene for any

---

In this case, the lack of a 911 call is of little importance, for multiple reasons. See State v. Carter, 183 N.E.3d 611, 629 (Ohio Ct. App. 2022) ("While there were no separate 911 calls reporting gunfire or any additional information in terms of a suspect, [Officers] Erwin and Gallagher were responding to an alert of shots fired, an inherently dangerous circumstance beyond general criminality. In their experience, they had recovered weapons in response to ShotSpotter alerts."). First, Nimmer concedes the reliability of ShotSpotter. Second, the officers arrived on scene no more than a minute after receiving the ShotSpotter report, which presumably issued shortly after the shots were detected. Whether a 911 call can be placed and relayed to officers within such a short period of time is questionable. See Marc L. Miller et al., Criminal Procedures: Cases, Statutes, and Executive Materials 428 (6th ed. 2019). Lastly, people do not always call 911 after hearing gunfire such that the lack of a 911 call discredits the ShotSpotter report. See Alexandra S. Gecas, Note, Gunfire Game Changer or Big Brother's Hidden Ears?: Fourth Amendment and Admissibility Quandaries Relating to ShotSpotter Technology, 2016 U. Ill. L. Rev. 1073, 1084 ("ShotSpotter enables the police to catch perpetrators without people fearing they are 'snitching' on their neighbors. . . . ShotSpotter highlights just how prevalent unreported gunfire is on city streets. . . . [C]ommunities that frequently experience gunfire are the least likely to report gunshots to the police."); Amanda Busljeta, Comment, How an Acoustic Sensor Can Catch a Gunman, 32 J. Marshall J. Info. Tech. & Privacy L. 211, 218 (2015) (explaining people who live in high crime areas are sometimes so desensitized to gun violence that they decline to call 911 when they hear gunfire).

17

number of reasons. See Rickmon, 952 F.3d at 883. While Nimmer could have been a random pedestrian out for a walk, the officers were not required to rule out any alternative explanation for his presence at the scene. Genous, 397 Wis. 2d 293, ¶8 (quoting Anderson II, 155 Wis. 2d at 84); see also Jones, 1 F.4th at 54. Additionally, common sense counsels that innocent pedestrians do not normally gather immediately near the location of gunfire, particularly late at night. See Rickmon, 952 F.3d at 884 (noting few vehicles are out at 4:45 a.m.).

¶31 The timing of the stop is particularly persuasive in light of Nimmer's close proximity to the exact location reported by ShotSpotter. Contrary to the court of appeals' analysis, this case is not about the extent to which a person's presence in a "high crime area" can contribute to reasonable suspicion. See Nimmer, No. 2020AP878-CR, ¶18 (quoting Gordon, 353 Wis. 2d 468, ¶18). For Fourth Amendment purposes, there is a difference between a person's presence at a location generally known for criminal activity and his presence at a location precisely pinpointed for gunfire by a reliable report in near real-time. See generally United States v. Holloway, No. 20-CR-00381, slip op., 2021 WL 5882147 *5 (N.D. Ill. Dec. 13, 2021) (explaining a suspect's presence in a high crime area is less valuable in a reasonable suspicion analysis than a suspect's presence near a location reported by ShotSpotter).

¶32 Officer Milone testified Nimmer was at "basically the exact location where the ShotSpotter came in." Consistent with this testimony, the circuit court found Nimmer was "very close"

18

to the reported location. Nimmer's "close proximity," both "temporally" and "spatially," to that location of gunfire weighs heavily in favor of reasonable suspicion. Commonwealth v. Raglin, 178 A.3d 868, 873 (Pa. Sup. Ct. 2018); see also Commonwealth v. Ford, 182 N.E.3d 1013, 1018 (Mass. Ct. App. 2022) ("The seizure of a suspect in geographical and temporal proximity to the scene of the crime appropriately may be considered as a factor in the reasonable suspicion analysis. It is particularly relevant where, as here, the officer encountered the defendant less than a minute after the last reported ShotSpotter alert, at the location where the trail of ShotSpotter alerts ended." (quotation marks and quoted source omitted)); Carter, 183 N.E.3d at 629 ("Carter was observed within four minutes of the officers receiving the alert within the specific area of the alert. In other words, as in Rickmon, the stop had temporal and physical proximity to the gunfire."); Funderburk v. United States, 260 A.3d 652, 660 (D.C. 2021) (noting "spatial and temporal proximity" to the location reported by ShotSpotter contributed to reasonable suspicion); Rickmon, 952 F.3d at 884 (concluding "the [Terry] stop's temporal and physical proximity to the shots" supported reasonable suspicion); Commonwealth v. Holness, 101 N.E.3d 310, 315 (Mass. Ct. App. 2018) ("The physical appearance of the Jaguar, and its proximity to the location of the ShotSpotter activation and broken glass, as well as the temporal proximity between the activation and recent motor vehicle accident, occurring in or around 4:00 A.M. on Christmas morning, when few

19

other vehicles were likely on the road, provided a sufficient nexus between the incriminating evidence in plain view and the accident scene.").

¶33 Nimmer was also the only person the officers observed temporally and spatially proximate to the scene. The absence of anyone else nearby strongly particularized the officers' suspicion. See Funderburk, 260 A.3d at 660-61; see also Ford, 182 N.E.3d at 1018; Carter, 183 N.E.3d at 629. The officers knew what (gunfire), when (a minute or two ago), and where (the reported address). While they did not know who fired the gun, they knew the shooter was likely near the reported location. Accordingly, "[t]he officers . . . limited the universe of potential suspects to those at a particular location" shortly after a serious crime occurred there. See Funderburk, 260 A.3d at 657. Because no one else was in the vicinity, this "universe" was "small enough that no description at all [was] required to justify [the Terry stop]." Id. (quoting In re T.L.L., 729 A.2d 334, 341 (D.C. 1999)); see also State v. Hairston, 126 N.E.3d 1132, 1137 (Ohio 2019) ("[T]he officers did exactly what one would expect reasonable and prudent police officers to do in their situation. Upon hearing gunshots, they proceeded immediately to the location they believed the shots to be coming from to investigate. Finding only Hairston in the area[,] . . . the officers were not required to ignore Hairston's presence[.]"); Rickmon, 952 F.3d at 884 (explaining the lack of a description of a suspect vehicle made little difference because officers observed only one vehicle temporally

20

and spatially proximate to the location reported by ShotSpotter).

¶34 Contributing to the totality of the circumstances supporting reasonable suspicion, Nimmer made furtive movements. Officer Milone testified, upon noticing the officers, Nimmer: (1) doubled his pace away from the officers; (2) dug around his left side with his left hand; and (3) bladed the left side of his body away from them. Notably, Nimmer's blading did not occur until Milone began approaching Nimmer on foot, and the closer the officers got to Nimmer, the more evasive his behavior became. Milone further testified, based on his training and experience, Nimmer's movements indicated he was considering fleeing and did not want the officers to see his left side. See Cortez, 449 U.S. at 418 ("[A] trained officer draws inferences and makes deductions . . . that might well elude an untrained person.").

¶35 Contrary to the court of appeals' characterization of Officer Milone's testimony, it was not "indeterminate" nor did he use "magic" words. The court of appeals erred by suggesting otherwise. See Nimmer, No. 2020AP878-CR, ¶¶26, 28. In fact, Milone's testimony was exacting.[13] He did not merely say Nimmer began walking faster——he said Nimmer doubled his pace. He did not simply say Nimmer began digging in a pocket——he said Nimmer dug around his left side with his left hand. He did not just

---

[13] We do not opine on the extent to which less exacting testimony from Officer Milone would have been sufficient.

21

say Nimmer bladed——he said, "[Nimmer] began turning his left side away from me. So at that point his left side was more forward and I could only really see his right side. . . . I was directly behind him on the sidewalk and his right hand was within view, but his left hand was not." Milone even mentioned Nimmer continued digging with his left arm as he bladed, although he could not see Nimmer's left hand. Milone further described when each of these movements occurred, and the particular inferences he drew from them. This case is not about conclusory or jargon-ridden testimony by an officer. The circuit court found Milone credible and had no trouble understanding what Milone meant. Nothing in the record indicates the circuit court erred——let alone clearly erred——by crediting Milone's testimony. See Brown, 392 Wis. 2d 454, ¶8 (quoting Smith, 379 Wis. 2d 86, ¶9); see also Carter, 183 N.E.3d at 629 ("We do not agree, as Carter suggests, that the officers used 'magic' words or language in testifying to establish reasonable suspicion. The court clearly found the officers' testimony to be credible, and we defer to the court's credibility assessment.").

¶36 Contrary to his argument, Nimmer's furtive movements were not "standing alone;" these movements combined with other facts to solidify the officers' particularized suspicion of Nimmer. See Anderson I, 389 Wis. 2d 106, ¶50 ("When combined with the information known to Officer Seeger about Anderson's history, Anderson's behavior creates reasonable suspicion that criminal activity was afoot. Anderson's movements after he

22

noticed Officer Seeger give rise to a reasonable inference that Anderson was trying to conceal something from the officer."); United States v. Diaz, No. 20-cr-176 (LAK), slip op., 2020 WL 6083404 *6 (S.D.N.Y. Oct. 15, 2020), appeal filed ("The defendants argue that a ShotSpotter report, 'standing on its own,' cannot be the basis of 'individualized suspicion.' But the ShotSpotter reports are only two pieces of the calculus. . . . [B]oth officers testified that they observed the defendants engage in 'nervous, evasive' behavior as they exited: the officers saw Diaz turn his body slightly and Hawkins pivot and hurry as their police car passed. Subsequently, Officer Bonczyk observed Diaz, whom Officer Lopez recognized from a prior arrest for assaulting an officer, creating tension with his sweatshirt that revealed a bulge that Officer Bonczyk thought was a gun. These observations provided the officers with reasonable suspicion that, of all the people coming and going from the area that night, Diaz and Hawkins were particularly suspect.").

¶37 In the course of responding within one minute after receiving a ShotSpotter report of gunfire in a residential neighborhood, the officers saw a single suspect near the scene make furtive movements suggesting concealment of a handgun. Looking at "the whole picture," as the officers were required to do, they made a well-informed and reasonable inference that Nimmer might be the shooter. See Genous, 397 Wis. 2d 293, ¶9 (quoting Cortez, 449 U.S. at 417–18). They did not act on a

23

"mere hunch[.]"    See Navarette, 572 U.S. at 397 (internal quotation marks removed).

¶38 Although this is the first occasion for this court to evaluate reasonable suspicion in the context of a ShotSpotter report, our court of appeals has considered whether the proximity of a person's presence shortly after shots were fired satisfies reasonable suspicion.    For example, in State v. Norton, No. 2019AP1796-CR, unpublished slip op., ¶¶14, 17 (Wis. Ct. App. Apr. 14, 2020), the court of appeals concluded the totality of analogous circumstances constituted reasonable suspicion to stop and investigate the defendant:

> The officers were investigating a report of shots fired, for which they had very little information besides the general vicinity of the incident. . . .
>
> Norton's presence in that area was not "standing alone"——it was accompanied by the information that there had been shots fired in the area, which the officers here were investigating.  Furthermore, when they illuminated the vehicle with their squad spotlight, they saw Norton make "furtive movements[,]" . . . which caused the officers to become concerned that he may have been trying to conceal a firearm, due to the nature of the call they were investigating.

(Quoted source omitted).   The court of appeals in that case persuasively emphasized the nature of the crime the officers were investigating——shots fired, which obviously is linked to criminal activity.  Id., ¶20.

¶39 As part of the reasonable suspicion analysis, multiple courts have emphasized the nature of the criminal activity the officers were investigating.    E.g., Trott v. State, 249

24

A.3d 833, 848 (Md. 2021), cert. denied sub nom., Trott v. Maryland, 142 S. Ct. 240 ("Additionally, in determining that the investigatory stop was reasonable under the circumstances, we also consider the gravity of the risk of public harm. . . . Balancing the public's interest in safety against the minimal intrusion occasioned by the brief investigatory stop here, and considering the totality of the facts presented to Officer Cooper in this case, we conclude that the scales of justice tilt in favor of the stop."). This court has recognized that when officers are aware of "an imminent threat to the public safety" the Fourth Amendment "do[es] not require the police to idly stand by in hopes that their observations reveal suspicious behavior before the imminent threat comes to its fruition." Rutzinski, 241 Wis. 2d 729, ¶26. "[T]he Fourth Amendment . . . appreciates the distinction between officers who illegitimately invoke Terry to stop someone who ran a red light six[] months ago and legitimately use it to stop someone who assaulted a spouse in the past half hour." United States v. Jones, 953 F.3d 433, 437 (6th Cir. 2020).

¶40 "[T]he amount of permissible intrusion is a function not only of the likelihood of turning up contraband or evidence of crime but also of the gravity of the crime being investigated." United States v. Goodwin, 449 F.3d 766, 769 (7th Cir. 2006) (citation omitted). Applying this common sense principle, the Seventh Circuit uses a "'sliding scale' approach" to determine the requisite quantum of suspicion: "if the crime being investigated is grave enough, the police can stop and

25

frisk without as much suspicion as would be required in a less serious criminal case." Id. The Seventh Circuit employed this approach in Rickmon, twice emphasizing "the dangerousness of the crime," 952 F.3d at 881-82, 884, and noting, "[w]e have repeatedly emphasized in our decisions that the inherent danger of gun violence sets shootings apart from other criminal activity." Id. at 883 (citing United States v. Burgess, 759 F.3d 708, 710-11 (7th Cir. 2014)). Similarly, in Burgess, the Seventh Circuit stated:

> At the outset we observe the dangerousness of the situation facing the officers and the public. . . . Multiple callers reported shots fired in the same general area, creating heightened suspicion of a serious crime, and for all the officers knew as they approached the area just minutes later, more than one shooting location was involved. The threat to public safety was serious, and the officers had to assume that it was continuing in process.
>
> Against the background of this ongoing threat, a number of considerations supported stopping Burgess's car in particular. . . .
>
> All told, the circumstances here——the dangerousness of the crime, the short lapse of time between the dispatches and the stop, the stop's proximity to the reported shots, the car's color, and the light traffic late at night——provided ample justification for stopping Burgess's car.

759 F.3d at 710-11; see also Commonwealth v. Meneus, 66 N.E.3d 1019, 1026 (Mass. 2017) (holding "the fact that the crime under investigation was a shooting, with implications for public safety" is relevant to determining the reasonableness of a Terry stop).

¶41 As Rickmon and Burgess illustrate, in Terry stop cases involving reported unlawful firearm use, "[t]here is a consistent theme[:] . . . if the police reasonably perceive danger to themselves or to members of the public, they have a duty to investigate[.]" Commonwealth v. Campbell, 867 N.E.2d 759, 763 (Mass. Ct. App. 2007) (quoted source omitted); see also Carter, 183 N.E.3d at 629 ("[Officers] Erwin and Gallagher were responding to an alert of shots fired, an inherently dangerous circumstance beyond general criminality."). "The unique dangers presented to law officers and law-abiding citizens by firearms are well chronicled." United States v. Bold, 19 F.3d 99, 104 (2d Cir. 1994) (citation omitted). The unlawful use of a firearm presents an "imminent danger," see United States v. Harrell, 268 F.3d 141, 151 (2d Cir. 2001) (Meskill, J., concurring), which may be considered in "the totality-of-the-circumstances test for determining reasonable suspicion" because of "the government's need for a prompt investigation." See Bold, 19 F.3d at 104 (citation omitted).

¶42 In this case, ShotSpotter reported four gunshots in a highly residential neighborhood. Officer Milone testified he was looking for "[a]nybody who is shot, any people who are shot, any potential suspects, anybody walking around still shooting, [and] any witnesses[.]" His testimony confirms the obvious: the officers had reason to believe lives were in danger.

¶43 The court of appeals erred in this case by relying too heavily on cases involving investigations of substantially less serious criminal activity——specifically, drug crimes——rather

27

than cases involving shots fired. See State v. Pugh, 2013 WI App 12, 345 Wis. 2d 832, 826 N.W.2d 418 (investigating a suspected drug crime); State v. Washington, 2005 WI App 123, 284 Wis. 2d 456, 700 N.W.2d 305 (investigating a complaint of loitering and drug sales).[14] "Th[e] element of imminent danger distinguishes a gun tip from one involving possession of drugs." United States v. Serrano, 598 F. App'x 72, 78 (3d Cir. 2015) (quoting United States v. Roberson, 90 F.3d 75, 81 n.4 (3d Cir. 1996)) (modification in the original).

¶44 ShotSpotter's detection of gunfire is comparable to an officer hearing it himself. See Amanda Busljeta, Comment, How an Acoustic Sensor Can Catch a Gunman, 32 J. Marshall J. Info. Tech. & Privacy L. 211, 219 (2015) ("With the acoustic sensors implemented in cities, police can feel a sense of reassurance that there is always a second pair of ears acting as backup."). When an officer hears gunfire, he has a duty to the public to react. If he arrives at the scene almost immediately after gunfire and sees only a few people——or in this case, one person——the officer may reasonably suspect criminal activity if any of them make furtive movements.

¶45 The only case the court of appeals considered involving reported gunfire was State v. Lewis, No. 2017AP234-CR, unpublished slip op. (Wis. Ct. App. July 25, 2017). In that

_____

[14] The error rests in relying on four cases, supra ¶17 & n.7, none of which were analogous, none of which were Wisconsin Supreme Court decisions, one of which was an unpublished court of appeals decision, and only one of which (the unpublished court of appeals decision) even involved shots fired.

28

case, officers were dispatched to investigate shots fired in a high crime area. Id., ¶¶2, 8. They were looking for three fleeing suspects, but they had a description of only one. Id., ¶2. The officers observed Travail L. Lewis in an alley "a few blocks from where the complaint was made" but Lewis did not match the description. Id., ¶1. Positioned behind Lewis, the officers noticed him holding the waistband of his pants. Id., ¶2. The officers conducted a Terry stop, and Lewis admitted he was carrying a concealed weapon. Id. The State "concede[d]" the "officers stopped Lewis simply based on the fact that he was walking in a high crime area shortly after [they] receiv[ed] an alert of 'shots fired'" and was "touch[ing] his waistband." Id., ¶8. The court of appeals accepted the State's concession and concluded the officers lacked reasonable suspicion. Id.

¶46 We do not consider whether the court of appeals correctly decided Lewis. Regardless, it is inapposite for multiple reasons. First, Lewis does not disclose the officers' response time——just that they arrived "shortly" after receiving the report. Id. The decision says Lewis was "a few blocks from where the complaint was made," id., ¶1, leaving Lewis' temporal and spatial proximity to the gunfire indeterminate. Finally, Lewis did not react to the officers, who saw him from behind and noticed him "holding the waistband of his pants." Id., ¶2. Whether Lewis even saw the officers before they ordered him to stop is unclear.[15]

---

[15] The court of appeals in this case could have considered another factually analogous opinion from its own court, State v.

29

¶47  In this case, the officers expeditiously responded to a reliable report of gunfire, generated in near real-time.  Upon arrival, they saw one person, Nimmer, who made furtive movements that, based on the officers' training and experience, indicated he was concealing a handgun.  The officers reasonably suspected Nimmer was involved in criminal activity, specifically, the shooting.  The officers' seizure of Nimmer accordingly complied with the Fourth Amendment.

IV.  JUSTICE DALLET'S CONCURRENCE

¶48  "The straw man was easily enough knocked over by the critic who set him up."

L.T. Hobhouse, The Theory of Knowledge 59 (New & Chapter Issue 1905).

¶49 Justice Dallet's concurrence mischaracterizes the court's opinion and the precedent it applies, creating a cloud of obfuscation over the opinion so that it will be read to mean something it doesn't actually say.  In common parlance, Justice Dallet creates a "straw man," meaning "a weak or imaginary opposition (such as an argument or adversary)," who is "set up

---

Tally-Clayborne, No. 2016AP1912-CR, unpublished slip op., ¶10 (Wis. Ct. App. Oct. 17, 2017) ("[Officer] Dillman traveled in the direction of the gunshots and within twenty to twenty-five seconds, Dillman saw Tally-Clayborne and two other individuals. Dillman did not see anyone else.  Given the potential safety risk, . . . the fact that Tally-Clayborne and his companions were the only individuals visibly present in the area of the shooting, and the fact that Tally-Clayborne attempted to walk away from the officers patting down his companions while reaching for his waistband, Dillman could reasonably suspect that Tally-Clayborne was involved in some sort of criminal activity.").

30

only to be easily confuted." Straw man, Merriam-Webster's Collegiate Dictionary (11th ed. 2014). By creating this straw man, Justice Dallet handily knocks down a weak argument of her own creation rather than address the legal principles actually propounded by the court. For this reason, judges and parties should exercise caution when citing statements in separate writings that purport to summarize or paraphrase the majority opinion, particularly when the author of the writing has not joined the majority opinion.

¶50 For starters, Justice Dallet attempts to distort the holding in this case, suggesting this court sanctions ShotSpotter being "used as a dragnet to justify warrantless searches of everyone the police find near a recently reported gunshot."[16] Nothing in this opinion suggests anything of the kind. As exhaustively explained, the totality of the circumstances obviously matters and it is the totality of the facts in this case which supports reasonable suspicion. See, e.g., supra ¶¶3, 24-30, 34, 36-37, 44, 47. The officers' arrival on the scene no more than one minute after the ShotSpotter report, where they found only Nimmer, was but one of multiple facts supporting reasonable suspicion.

---

[16] Justice Dallet's Concurrence, ¶67. In misstating the holding in this case, Justice Dallet analogizes it to the circuit court's conclusion that the police should investigate anyone in the vicinity within a minute or two of the ShotSpotter alert. Id., ¶67 n.7. Contrary to Justice Dallet's insinuation, we agreed with the court of appeals' conclusion that this statement exceeds the boundaries of the Fourth Amendment. See supra ¶20 n.9.

¶51 Justice Dallet further misrepresents the majority opinion as advancing "the novel suggestion 'that the quantum of suspicion necessary to conduct an investigatory stop is lower for the type of criminal investigation that occurred here.'"[17] The majority opinion does not say this; Justice Brian Hagedorn's concurrence does. Citing Rutzinski, the State argued "[o]ne additional factor supports reasonable suspicion here: police were investigating a shots-fired report, which implicated immediate public-safety concerns." Although the State thoroughly briefed the issue, the defendant did not respond. Like the defendant, Justice Dallet never analyzes Rutzinski, even though it debunks her classification of the analysis as novel.

¶52 Justice Dallet lapses into the same error made by the court of appeals in this case: evaluating the facts in isolation rather than as part of the "whole picture." For example, she says "there is nothing especially suspicious about finding someone alone on a residential street just after 10:00 PM on a Saturday night in the summertime."[18] This is true, but no one suggests otherwise. Justice Dallet also says, "the possibility that a crime has been committed in a certain neighborhood doesn't cast suspicion over everyone there."[19] Again, no one claims it does. Next, Justice Dallet says the

---

[17] Justice Dallet's Concurrence, ¶61 n.1.

[18] Id., ¶64.

[19] Id.

police "could not assume that Nimmer was responsible for the reported gunshots simply because he was the only person they saw when they showed up in his neighborhood."[20] They didn't; it was his solitary presence at the location of recent gunfire, combined with his furtive movements, which gave rise to reasonable suspicion, as Justice Dallet ultimately concedes.[21]

¶53 Justice Dallet, however, does not seem to think the nature of the criminal activity being investigated matters much when determining the reasonableness of a stop, characterizing the consideration of gun violence as going beyond "a standard _Terry_ analysis."[22] She similarly dismisses the seriousness of

_____

[20] Id.

[21] Justice Dallet also says, "Nimmer's case is unlike many of those cited by the majority/lead opinion, where courts held that the police had reasonable suspicion to stop the only people they found at the scene of reported gunfire late at night, in an alleyway or dead-end street where shots were heard recently, or both." Id. (emphasis added). She then cites three cases on which we have relied: Jones, Rickmon, and Funderburk. Justice Dallet draws a distinction bearing no difference under the Fourth Amendment.

In Jones, officers stopped the suspect "in a residential neighborhood in Washington D.C." 1 F.4th at 51. In Rickmon, officers stopped a suspect in a residential area of Peoria, Illinois, which, while not as urbanized as Washington, D.C., is hardly a rural community. 952 F.3d at 879; see also id. at 886 (Wood, J., dissenting) (describing the residential nature of the area). Indeed, the court noted when one officer arrived on scene, he "observed a crowd of about 15-20 people at the street's dead end, approximately 300 feet from him." Id. at 879 (majority op.). In Funderburk, "two police officers heard gunshots and commotion coming from a nearby alley in a residential neighborhood." Funderburk v. United States, 260 A.3d 652, 654 (D.C. 2021).

[22] Justice Dallet's Concurrence, ¶¶70, 72.

33

the crime as a factor in the analysis of a tip's reliability. This is not the law; the Court in Florida v. J.L., 529 U.S. 266 (2000) and this court as well as other courts applying its holding have already rejected the premise of Justice Dallet's concurrence.

¶54 In J.L., police received an anonymous tip that a person at a bus stop was concealing——not shooting——a firearm. Id. at 268, 273 n.*.  The tip had little to no indicia of reliability and "[a]part from the tip, the officers had no reason to suspect . . . illegal conduct.  The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements."  Id. at 268 (emphasis added).  Under these facts, the Court concluded the officers unlawfully executed a Terry stop, expressly disavowing "an automatic firearm exception to our established reliability analysis"[23] because it would "enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun."  Id. at 272 (emphasis added).  The Court's holding was limited to an uncorroborated tip of someone carrying a gun:

> The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability.  We do

---

[23] While the nature of the criminal activity is relevant under our analysis, it is not dispositive.  See Commonwealth v. Meneus, 66 N.E.3d 1019, 1026 (Mass. 2017).

not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk.

Id. at 273-74. Relying on this limitation, this court and lower courts have factored the nature of the suspected criminal activity into their reasonable suspicion analyses in exactly the same manner we do in this case.

¶55 In Rutzinski, this court held:

> [W]hen assessing whether a stop is constitutionally reasonable, a reviewing court must balance the interests of the individual being stopped against the interests of the State to effectively root out crime. Hensley, 469 U.S. at 228, 105 S.Ct. 675; McGill, 2000 WI 38, at ¶ 18, 234 Wis.2d 560, 609 N.W.2d 795; Waldner, 206 Wis.2d at 56, 556 N.W.2d 681. . . . [W]here the allegations in the tip suggest an imminent threat to the public safety or other exigency that warrants immediate police investigation. . . . the Fourth Amendment and Article I, Section 11 do not require the police to idly stand by in hopes that their observations reveal suspicious behavior before the imminent threat comes to its fruition. Rather, it may be reasonable for an officer in such a situation to conclude that the potential for danger caused by a delay in immediate action justifies stopping the suspect without any further observation. Thus, exigency can in some circumstances supplement the reliability of an informant's tip in order to form the basis for an investigative stop. Cf. City of Indianapolis v. Edmond, 531 U.S. 32, ----, 121 S.Ct. 447, 455, 148 L.Ed.2d 333 (2000) (noting that exigencies of some scenarios likely would outweigh the individual's right to be free from an investigative traffic stop).

241 Wis. 2d 729, ¶26 (emphasis added). This court noted the limited reach of J.L., explaining "the Court implicitly affirmed that there are circumstances in which exigency can supplement—

35

or, in very extreme circumstances, possibly supplant——the . . . reliability analysis." Id., ¶29 n.6.

¶56 Throughout our opinion in Rutzinski, this court repeatedly emphasized that imminent danger is a factor to be considered in determining the reasonableness of a Terry stop. Id., ¶26 ("[E]xigency can in some circumstances supplement the reliability of an informant's tip in order to form the basis for an investigative stop." (citing City of Indianapolis v. Edmond, 531 U.S. 32, 42-43, 121 S. Ct. 447, 455 (2000))); id., ¶34 ("[U]nlike the tip in J.L., the tip in the present case suggested that Rutzinski posed an imminent threat to the public's safety."); id., ¶35 ("In light of the potential for imminent danger that drunk drivers present, the informant's allegations suggesting that Rutzinski may have been intoxicated supplemented the reliability of the tip, and further justified Officer Sardina's investigative stop."); id., ¶36 ("Because drunk driving is an extraordinary danger, we cannot adopt Rutzinski's position that the police must dismiss allegations of possible drunk driving when assessing whether an informant's tip justifies a traffic stop. While such allegations cannot form the sole basis for an investigative stop, they certainly must be considered when examining the totality of the circumstances surrounding particular police conduct." (emphasis added)); id., ¶37 ("Unlike the tip in J.L., the informant's tip in this case contained sufficient indicia of reliability and alleged a potential imminent danger to public safety." (emphasis

36

added)).[24] Far from being "unnecessary" digressions, a report of serious criminal activity "must be considered" as part of the reasonable suspicion analysis.

¶57 Notwithstanding this precedent, Justice Dallet fails to acknowledge the seriousness of gunfire in a residential area, asserting this court's "analysis places too much weight on some of these facts, including the residential setting" and "puts too much emphasis on the officers' reliance on ShotSpotter."[25]

---

[24] Consideration of the nature of a reported crime is not restricted to tips involving guns; as Chief Justice John Roberts has noted, "the especially grave and imminent dangers posed by drunk driving" have prompted "[t]he majority of courts examining the question" to uphold "investigative stops of allegedly drunk or erratic drivers, even when the police did not personally witness any traffic violations before conducting the stops." Virginia v. Harris, 130 S. Ct. 10, 11 (2009) (Roberts, C.J., dissenting from denial of certiorari). In doing so, "[t]hese courts have typically distinguished J.L.'s general rule" in part based on the "grave and imminent dangers" drunk driving presents. Id. Notably, one of the cases Chief Justice Roberts cited for the proposition was Rutzinski. See also Trott v. State, 249 A.3d 833, 848 (Md. 2021), cert. denied sub nom., Trott v. Maryland, 142 S. Ct. 240 ("Unlike crimes involving possessory offenses, such as carrying an illegal gun or possessing drugs, the crime of drunk driving poses a significant and potentially imminent public danger."); Andrew J. Sheehan, Comment, Getting Drunk Drivers off Illinois Roadways: Addressing the Split of Authority Regarding 911 Tips & Investigatory Traffic Stops, 39 S. Ill. U. L.J. 537, 551 (2015) ("Arguably the most widely-accepted justification for adopting a drunk driving exception is the very unique and imminent danger an intoxicated person behind the wheel poses to the general public.").

[25] Justice Dallet's Concurrence, ¶¶64, 65. Doubling down on the misguided notion that gunfire in a residential area is not a reliable indicator of criminal activity, Justice Dallet maintains a ShotSpotter report could not affect the reasonable suspicion analysis because even "[a] reliable tip will justify an investigative stop only if it creates reasonable suspicion

37

Although Justice Dallet does not quantify the weight she would give to these facts (if any), to suggest a shooting in a highly residential area should not be considered as part of the totality of circumstances supporting reasonable suspicion is an extraordinary misjudgment of the risk to the community. A shooter is not entitled to "one free shot," (at least when that shot signals gun violence is afoot) Justice Dallet's theory notwithstanding. Cf. Virginia v. Harris, 130 S. Ct. 10, 12 (2009) (Roberts, C.J., dissenting from denial of certiorari) ("The effect of the rule below will be to grant drunk drivers 'one free swerve' before they can legally be pulled over by police. It will be difficult for an officer to explain to the family of a motorist killed by that swerve that the police had a tip that the driver of the other car was drunk, but that they were powerless to pull him over, even for a quick check."). While believing a report of shots fired in a residential neighborhood deserves less "emphasis" in the analysis, Justice Dallet seems to give greater weight to Nimmer's furtive movements, but she does not explain why. If Justice Dallet's focus on Nimmer's "digging around his left side" and "turning and walking away after seeing the police" were all the Fourth Amendment requires for reasonable suspicion to stop a suspect,

---

that 'criminal activity may be afoot.'" Id., ¶71 (citing Navarette v. California, 572 U.S. 393, 401 (2014) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968))).

her conception of the law could ensnare many more people in the "dragnet" she ostensibly rejects.[26]

¶58 While she may deem unreasonable the decisions of the United States Supreme Court, federal appellate courts, and this court regarding what is reasonable under the Fourth Amendment, our opinion is in line with precedent and Justice Dallet's analysis is an outlier. In Goodwin, Judge Richard Posner, writing for a unanimous Seventh Circuit panel, explained:

> [I]n Florida v. J.L., 529 U.S. 266, 273-74, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), [the Court] said that "we do not say, for example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk." In other words, if the crime being investigated is grave enough, the police can stop and frisk without as much suspicion as would be required in a less serious criminal case.

449 F.3d at 769 (emphasis added). Judge Posner interpreted J.L. to permit a "'sliding scale' approach[.]" See id. Post-J.L., the Seventh Circuit, aligned with many other courts, has relied on the inherent danger of gun violence as a factor supporting the constitutionality of a Terry stop, including in ShotSpotter cases. E.g., Rickmon, 952 F.3d at 883 ("We have repeatedly emphasized in our decisions that the inherent danger of gun violence sets shootings apart from other criminal activity." (citation omitted)). Gun violence, obviously, is not the same thing as mere "carriage of a gun," which is all that was

---

[26] Justice Dallet's Concurrence, ¶¶67-69. We do not mean to suggest that furtive movements cannot, in some circumstances, be highly indicative of criminal activity.

39

reported in J.L. 529 U.S. at 272. Although the concurrence disregards this stark difference, it matters for purposes of the reasonable suspicion analysis.

### V. CONCLUSION

¶59 The Fourth Amendment guarantees the inherent right of the people to be secure against unreasonable searches and seizures. We recognize "the police are not infallible[.]" Smith, 379 Wis. 2d 86, ¶36. In exercising their duty to investigate crime, officers sometimes violate people's constitutional rights. Id. When that happens, "it is the duty of this court to impose consequences[.]" Id. (citation omitted). "Likewise, when the police abide by the rules and act reasonably, the Fourth Amendment is not violated and we must uphold convictions." Id.

¶60 This case represents a reasonable seizure. The officers did not violate Nimmer's Fourth Amendment right. Based on the totality of the circumstances, they reasonably suspected Nimmer was involved in criminal activity presenting an imminent threat to public safety. Nimmer's conviction stands.

*By the Court.*——The decision of the court of appeals is reversed.

¶61 REBECCA FRANK DALLET, J. (*concurring*). I agree with the majority/lead opinion's[1] holding that the police had particularized reasonable suspicion to stop and frisk Nimmer. I write separately, however, because I am concerned that the majority/lead opinion's analysis of certain facts may cause lower courts to read our decision too broadly. I also worry that the majority/lead opinion over-complicates its analysis by importing Fourth Amendment principles from other contexts, even though this case requires only a straightforward application of Terry.[2] Therefore, I respectfully concur.

¶62 In order to justify a Terry stop, the police must have "reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Reasonable suspicion must be founded on concrete, particularized facts warranting suspicion of a certain individual, not "'inchoate and unparticularized suspicion[s] or hunch[es].'" Id. at 124 (quoting Terry, 392 U.S. at 27). We assess reasonable suspicion in light of the totality of the circumstances; that is, the facts officers knew at the time of

---

[1] I refer to Justice Rebecca Grassl Bradley's opinion as the "majority/lead opinion" because a majority of the court has not joined the opinion in its entirety. Specifically, a majority did not join the portions of the opinion that respond to this concurrence (majority/lead op., ¶¶48-58 & 29 n.12), and those that contain the novel suggestion "that the quantum of suspicion necessary to conduct an investigatory stop is lower for the type of criminal investigation that occurred here" (majority/lead op., ¶¶28 and 39-47). See Justice Hagedorn's concurrence, ¶74.

[2] Terry v. Ohio, 392 U.S. 1 (1968).

1

the stop. See United States v. Cortez, 449 U.S. 411, 417-18 (1981).

¶63 This is what the police knew when they stopped Nimmer:

- On Saturday, June 15, 2019, they received a ShotSpotter report at 10:06 PM indicating that four shots may have been fired near the intersection of 21st and Townsend Streets on the North Side of Milwaukee.

- They reached that location about one minute after they received the ShotSpotter report.

- Nimmer was walking on the sidewalk "in very close proximity" to that location and no one else was present.

- After noticing their arrival, Nimmer accelerated his pace and turned his left side away from the approaching officer ("blading," in one officer's words) while "digging around his left side with his left hand."[3]

---

[3] These facts, with the exception of Nimmer digging around his left side, are taken from the circuit court's findings of fact after a suppression hearing, and were not challenged on appeal. The circuit court did not make a finding that Nimmer was digging around his left side. Nonetheless, it was a part of one of the officers' uncontroverted testimony at the suppression hearing, and is therefore appropriate to consider in the reasonable-suspicion analysis. See State v. McGill, 2000 WI 38, ¶24, 234 Wis. 2d 560, 609 N.W.2d 795.

It appears from testimony at the suppression hearing that there is body-camera footage of the officers' encounter with Nimmer. Although this footage might have been useful in determining what happened, it was not introduced at the suppression hearing or otherwise made a part of the record.

Relying on these facts, officers stopped Nimmer, searched him, and found a handgun in his left waistband.

¶64 Although the majority/lead opinion correctly concludes that officers had particularized reasonable suspicion to stop Nimmer, its analysis places too much weight on some of these facts, including the residential setting. To be sure, the residential setting is part of the totality of the circumstances informing our reasonable-suspicion analysis. But the possibility that a crime has been committed in a certain neighborhood doesn't cast suspicion over everyone there. See United States v. Bohman, 683 F.3d 861, 864 (7th Cir. 2012) (the "mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone" nearby). Moreover, there is nothing especially suspicious about finding someone alone on a residential street just after 10:00 PM on a Saturday night in the summertime.[4] See id. In this respect, Nimmer's case is unlike many of those cited by the majority/lead opinion, where courts held that the police had reasonable suspicion to stop the only people they found at the scene of reported gunfire late at night, in an alleyway or dead-end street where shots were heard recently, or both. See, e.g., United States v. Jones, 1 F.4th 50, 51 (D.C. Cir. 2021) (reasonable suspicion to stop the only person on the street walking quickly away from the location of a late-night ShotSpotter alert and reaching for his waistband); United States v. Rickmon, 952 F.3d 876, 882-84 (7th

_____

[4] Indeed, although the officers didn't know it at the time, Nimmer was walking near his house when the officers arrived.

3

Cir. 2020) (reasonable suspicion to stop the only car driving down a two-block dead-end street away from the location of two ShotSpotter reports and two 9-1-1 calls at 4:45 AM); Funderburk v. United States, 260 A.3d 652, 660-61 (D.C. 2021) (reasonable suspicion to stop four people in an alleyway at 2:20 AM on a weeknight after officers heard gunshots). Thus, even though the officers didn't have to rule out all innocent explanations before stopping Nimmer, they also could not assume that Nimmer was responsible for the reported gunshots simply because he was the only person they saw when they showed up in his neighborhood. See State v. Genous, 2021 WI 50, ¶8, 397 Wis. 2d 293, 961 N.W.2d 41.

¶65 The majority/lead opinion similarly puts too much emphasis on the officers' reliance on ShotSpotter, stressing both Nimmer's counsel's concession that it is reliable and the officers' quick response to the system's report. Majority/lead op., ¶¶4, 29-30. But when it comes to assessing whether the police had reasonable suspicion that a particular person may

4

have fired the shots, ShotSpotter has limitations.[5] A ShotSpotter report doesn't tell the police whether there is one shooter or several, what those individuals look like, what they are wearing, whether they remained on the scene or fled immediately, whether they got into a car or left on foot, or even if they were indoors or outdoors. All a ShotSpotter report tells the police is that shots may have been fired near a particular place; it doesn't provide reasonable suspicion that any particular person fired them. See Wardlow, 528 U.S. at 124. Obviously, this is not to say that the police shouldn't swiftly investigate a ShotSpotter alert in a residential neighborhood; only that they do so with full knowledge of the system's limitations.

---

[5] Despite counsel's concession that ShotSpotter is reliable, there are good reasons to doubt its reliability and to be concerned about the other Fourth Amendment issues raised by the technology. For example, an exhaustive review of the Chicago Police Department's use of ShotSpotter revealed that in more than 90% of cases where the police responded to a ShotSpotter report, they found no evidence of a gun-related crime. See City of Chicago Office of Inspector General, The Chicago Police Department's Use of ShotSpotter Technology, at 2-3 (Aug. 2021), available at https://igchicago.org/wp-content/uploads/2021/08/Chicago-Police-Departments-Use-of-ShotSpotter-Technology.pdf. Additionally, the report found that officers were, in some cases, using the total number of ShotSpotter reports in a given area as a reason to conduct more investigatory stops and pat-downs. See id. at 19. Another study found that ShotSpotter has no significant impact in reducing gun crimes. See generally Mitchell L. Doucette, et al., Impact of ShotSpotter Technology on Firearm Homicides and Arrests Among Large Metropolitan Counties: A Longitudinal Analysis, 1999–2016, 98 J. Urban Health 609 (2021). Nevertheless, because Nimmer's counsel did not challenge ShotSpotter's reliability or raise any of these other issues, I leave them for another day.

¶66 The majority/lead opinion's analysis of the officers' response time also rests on a consequential assumption. The record doesn't reveal how much time passed between the time shots were fired and when the officers arrived on the scene; only how quickly the officers responded after receiving the ShotSpotter alert from dispatch. Before a ShotSpotter report reaches the officers, a person at ShotSpotter's offices in California listens to a recording flagged by the system and decides if it sounds like gunshots. Once that person confirms the sound is likely gunfire, then police dispatch is alerted, which in turn alerts nearby officers. Thus, even though officers arrived at 21st and Townsend one minute after receiving the report from a dispatcher, that does not mean they arrived within one minute of shots being fired. This is not a trivial issue; it may be the difference between whether or not an officer's suspicion of a person on the scene is particularized and reasonable.[6]

¶67 No matter how accurate ShotSpotter is or how quickly officers respond to a ShotSpotter alert, it cannot be used as a dragnet to justify warrantless searches of everyone the police

---

[6] This timing difference is what distinguishes Nimmer's case from those relied on by the majority/lead opinion in which officers responded within seconds to the sound of gunshots they heard. See, e.g., State v. Hairston, 126 N.E.3d 1132, 1136-37 (Ohio 2019) (reasonable suspicion to stop the only person officers saw near a school after hearing shots 30 to 60 seconds before); State v. Tally-Clayborne, No. 2016AP1912-CR, unpublished slip op., ¶10 (Wis. Ct. App. Oct. 17, 2017) (reasonable suspicion to stop a person reaching for his waistband and walking away from an area where officers heard shooting less than thirty seconds before).

6

find near a recently reported gunshot.[7]  See Bohman, 683 F.3d at 864 (explaining that suspecting a crime occurred in a particular place does not mean that everyone leaving that place is suspicious).  At its best, ShotSpotter gives officers only a reason to go to a particular place, but it's what they find there that is most relevant to the analysis of whether they had particularized, reasonable suspicion.  See Genous, 397 Wis. 2d 293, ¶8 ("Reasonable suspicion must be supported by specific and articulable facts.").

¶68  Collectively, the facts the officers observed, together with the ShotSpotter alert, are sufficient to establish reasonable suspicion——even though each fact alone would not clear that bar.  See id., ¶9.  When the officers arrived at the location of the ShotSpotter alert, Nimmer saw their marked squad car and started walking faster.  When one of the officers got out of the car and started to walk toward him, Nimmer turned the left side of his body away and started digging around his left

---

[7] This is why the circuit court was wrong to suggest that "anyone that [the police] encountered within a minute or two of receiving the [ShotSpotter] alert should have been investigated if they were within a couple of blocks of the alleged shots being fired." The U.S. Supreme Court has emphasized, however, that simply being present "in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Wardlow, 528 U.S. at 124.  The reason for that is simple: Knowledge that someone committed a crime in a particular place is not a particularized reason to suspect that everyone at or near that place committed a crime.  To conclude otherwise would undermine the central purpose of the Fourth Amendment, which is prohibiting general warrants that grant the police the "unchecked power" to search anywhere for anyone or any thing. See State ex rel. Two Unnamed Petitioners v. Peterson, 2015 WI 85, ¶90, 363 Wis. 2d 1, 866 N.W.2d 165.

7

side with his left hand. As the court of appeals rightly explained, turning and walking away after seeing the police is not enough to give rise to reasonable suspicion. See State v. Nimmer, No. 2020AP878-CR, unpublished slip op., ¶¶16-17, 19-20 (Wis. Ct. App. Dec. 15, 2020). Absent reasonable suspicion or a lawful order to the contrary, people are free to walk (even quickly) away from the police officers. See State v. Young, 2006 WI 98, ¶73, 294 Wis. 2d 1, 717 N.W.2d 729. And law-abiding citizens may not want to interact with the police for all kinds of reasons. The fact that Nimmer turned his body away from the officers does not make his walking away suspicious. After all, "how does a person walk away from another (as [Nimmer] had the right to do) without turning his . . . body to some degree?" See State v. Pugh, 2013 WI App 12, ¶12, 345 Wis. 2d 832, 826 N.W.2d 418. Calling Nimmer's turn "blading," as an officer did in this case, "adds nothing to the calculus except a false patina of objectivity." Id.

¶69 The totality of the circumstances also includes the fact, undisputed yet unaddressed by the court of appeals, that while Nimmer was walking away from the police and turning his body, he was also "digging" around his left side. Of course, "many folks, most innocent of any nefarious purpose, . . . occasionally pat the outside of their clothing to ensure that they have not lost their possessions." State v. Gordon, 2014 WI App 44, ¶17, 353 Wis. 2d 468, 846 N.W.2d 483. But an isolated pat of the pants pocket or touch of the waistband is not the same thing as "digging around" one's left

8

side while walking quickly away from the police in a place where officers had reason to believe shots were recently fired. Cf. State v. Lewis, No. 2017AP234-CR, unpublished slip op., ¶¶7-8 (Wis. Ct. App. July 25, 2017) (concluding that there was no reasonable suspicion to stop someone who "was not looking over his shoulder for police" and did not match the description of a suspect just because he was "walking in a high crime area" shortly after a report of shots fired and "touched his waistband"). Thus, despite my differences with parts of the majority/lead opinion's analysis, I agree that the totality of these circumstances meets the Terry threshold.

¶70 That straightforward application of Terry is all that's needed to resolve this case. The majority/lead opinion, however, unnecessarily goes further, discussing how the type of crime being investigated may affect the Terry analysis. At times, that discussion seems to endorse a "sliding-scale approach" to reasonable suspicion that the Seventh Circuit cobbled together from Fourth Amendment principles in dissimilar contexts, such as traffic stops, dog-sniff drug searches, and highway roadblocks. See, e.g., United States v. Goodwin, 449 F.3d 766, 769-70 (7th Cir. 2006). The U.S. Supreme Court has admonished courts against taking such a mix-and-match approach, even when applying general Fourth Amendment principles. See Illinois v. Lidster, 540 U.S. 419, 424 (2004). And we have never adopted the Seventh Circuit's approach, likely because it is an awkward fit with Terry. After all, Terry already "responds to" the dangers of firearms and "the serious threat

9

that armed criminals pose to public safety" by authorizing limited searches and seizures upon less than probable cause. See Florida v. J.L., 529 U.S. 266, 272 (2000).

¶71 The majority/lead opinion gets similarly sidetracked by focusing on cases that have relaxed the usual corroboration requirements for anonymous tips when the police are responding to a potential emergency. See majority/lead op., ¶¶39, 53-58 & n.24-25. But corroboration is not an issue here, and even if it were, the same Terry reasonable-suspicion standard would apply. See Navarette v. California, 572 U.S. 393, 401 (2014) ("[A] reliable tip will justify an investigative stop only if it creates reasonable suspicion that 'criminal activity may be afoot.'" (quoting Terry, 392 U.S. at 30)).

¶72 Because a standard Terry analysis resolves this case, I would stop there. Accordingly, I concur with the majority/lead opinion's ultimate conclusion that the officers had reasonable suspicion to stop Nimmer. I emphasize, though, that the totality of the circumstances in every case will be unique and that lower courts should not give too much weight to any individual fact.

¶73 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this concurrence.

¶74 BRIAN HAGEDORN, J. *(concurring).* I agree with the court's determination that reasonable suspicion supported the stop. However, portions of the court's opinion go farther than necessary. In particular, the opinion suggests——for what appears to be the first time in the Wisconsin reports——that the quantum of suspicion necessary to conduct an investigatory stop is lower for the type of criminal investigation that occurred here. I do not believe this issue was developed in a sufficiently meaningful way for me to opine on it, and resolving it is unnecessary to decide this case. Therefore, I concur and join the court's opinion only in part.[1]

---

[1] I join the opinion except for ¶28, ¶29 n.12, and ¶¶39-58.